UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
KYOEI FIRE & MARINE INSURANCE CO., :
LTD., and NATIONAL FEDERATION OF   :
AGRICULTURAL CO-OPERATIVE          :
ASSOCIATIONS,                      :
                                   :
                  Plaintiffs,      :    06 Civ. 2043 (LAP)
                                   :
        -against-                  :    MEMORANDUM AND ORDER
                                   :
M/V MARITIME ANTALYA, her engines, :
tackle, apparel, furniture, etc.,  :
in rem, and SK SHIPPING CO., LTD., :
SUN GLORY MARITIME CORP., and      :
SOJITZ MARINE & ENGINEERING CORP., :
                                   :
                  Defendants.      :
----------------------------------x

LORETTA A. PRESKA, U.S.D.J.

        This case involves a dispute over cargo that was damaged

during transport across the Pacific Ocean in mid-late March

2005.  A bench trial is scheduled to commence on

October 22, 2007.  Presently before the Court is Plaintiffs'

motion for discovery sanctions.  For the following reasons,

Plaintiffs' motion is granted in part and denied in part.


                        BACKGROUND

        The factual background underlying this action is set forth

in this Court's prior decisions, familiarity with which is

presumed.  See Kyoei Fire & Marine Ins. Co., Ltd. v. M/V Maritime

Antalya, No. 06 Civ. 2043, 2006 WL 3378683 (S.D.N.Y.

Nov. 20, 2006), reconsideration denied, 2006 WL 3802209
(S.D.N.Y. Dec. 22, 2006).  The pertinent facts for this motion
are summarized below.[1]


A.    The Allegations In The Action

        Plaintiff Kyoei Fire and Marine Insurance Co., Ltd. ("Kyoei
Fire") is a foreign corporation with a principal place of
business in Tokyo, Japan. (Compl. ¶ 3.)[2]  Kyoei Fire was the
insurer of the shipment of corn at issue. (Compl. ¶ 3.)
Plaintiff National Federation of Agricultural Cooperative
Associations ("Zen-Noh") is a foreign entity with a place of
business in Japan. (Compl. ¶ 4.)  Zen-Noh is in the business of
purchasing, selling, and importing grain cargoes from the United
States to Japan and was the owner of the shipment of corn at
issue. (Compl. ¶ 4.)  Kyoei Fire and Zen-Noh are referred to
collectively herein as "Plaintiffs."

        Defendant M/V Maritime Antalya (the "Vessel") was a
merchant vessel engaged in the carriage of goods by sea for
hire. (Compl. ¶ 5.)  Defendants SK Shipping Co., Ltd. ("SK
Shipping") and Sun Glory Maritime Corp. ("Sun Glory") are
foreign corporations that do business as carriers of merchandise

---

[1] Unless otherwise noted, this section contains only those facts which are
undisputed.

[2] "Compl." refers to the "Third Amended Verified Complaint" filed on
November 1, 2006.

by sea for hire and "owned, chartered, managed and/or otherwise controlled the Vessel . . . ." (Compl. ¶¶ 6-7.)  Defendant Sojitz Marine & Engineering Corp. ("Sojitz")[3] and Temm Maritime Co. Ltd. ("Temm")[4]  are Japanese corporations "engaged in the business of managing the affairs of the Vessel and Sun Glory, and were responsible for the inspection, maintenance and repair of the Vessel and the hiring, training, supervising and evaluation of a competent crewing company and/or well trained and suitably experienced crew to man the Vessel." (Compl. ¶ 8.) Unless otherwise noted, the Vessel, SK Shipping, Sun Glory, Sojitz, and Temm are referred to collectively herein as "Defendants."

On or about February 14, 2005, a consignment of corn and other grain was shipped and delivered in good order and condition to the Vessel and the other Defendants at Convent, Louisiana. (Compl. ¶¶ 16-17.)  The shipment was to be delivered to destinations in Japan. (Compl. ¶ 17.)  En route to Japan, sea water entered the cargo holds of the Vessel. (Compl. ¶ 20.)  The shipment was delivered to the specified destinations in Japan

---

[3] On June 22, 2007, Sojitz filed a motion for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure seeking an order of dismissal on the ground that it owed no duty of care to Plaintiffs and thus cannot be liable for any negligence.  That motion was denied in a separate Memorandum and Order issued on October 3, 2007.

[4] On May 22, 2007, the Court entered the parties' stipulation dismissing the case against Temm. (See Dkt. No. 91.)

but not in the same quantity, good order and condition as when
shipped.  (Compl. ¶ 22.)

Due to the shipment having been damaged, Kyoei Fire paid an
amount up to or exceeding $6,000,000.00 in damages to Zen-Noh.
(Compl. ¶ 23.)  On March 15, 2006, this action was commenced
seeking, inter alia, monetary damages amounting to or exceeding
$6,000,000.00, plus interest and costs, including attorneys'
fees.[5] (Compl. ¶¶ 50, 52.)

B.    The Course Of Discovery

As stated by Lawrence G. Cohen, counsel for the Defendants,
"[the Court] has been intimately involved with the pretrial
discovery in this case . . . ." (Tr. 108/14-15.)[6]  The Court has
been called upon by the parties to review numerous submissions,
participate in several lengthy teleconferences, and intervene in
various discovery disputes ranging from the mode, date,
location, and cost of depositions (see, e.g., dkt. nos. 12 & 85)
to assertions of privilege over documents (see dkt. no. 82).
Prior to this decision, the Court has issued at least thirteen
different orders regarding discovery disputes. (See Dkt. Nos.
12, 13, 49, 52, 53, 74, 77, 78, 82, 85, 90, 111 & 122.)

---

[5] For reasons discussed infra at note 45, Plaintiffs were granted leave to
amend the Third Amended Verified Complaint to add punitive damages in the
"Prayer for Relief." (Compl. ¶¶ 48-53.)

[6] "Tr." refers to transcript of the oral argument on Plaintiffs' motion for
discovery sanctions dated July 23, 2007. (Dkt. No. 109.)

In the past 15 years, the Court has not often had occasion to deliver the following reprimand to counsel at the conclusion of a discovery conference:

> Mr. Cohen, you personally are warned to change your behavior.  Items like your letter dated January 16 in which you say you won't make yourself available have got to stop.  The ad hominem attacks on counsel have got to stop.  The lack of cooperation by, for example, not giving counsel a range of dates for the [deposition of the] [T]hird [M]ate who we've just been discussing has got to stop.
>
> You are on notice that you might very well be sanctioned for unnecessarily multiplying the proceedings, not to mention for not complying with discovery.  It has got to stop.  The types of discovery issues that we have had in this case, that we have discussed today, are things which ought to be worked out by counsel without having to involve the Court.  There is no reason for this to go on.  There is no reason at all to check on the burial date of adversary counsel's father-in-law.[7]  There is no need for that.  And it should stop immediately.

(Reply Mem., Ex. 6 at 48/3-19.)[8]

Since Plaintiffs' motion relates, in part, to Defendants' compliance with regard to prior discovery rulings, it is with

---

[7] Plaintiffs objected to the deposition of the Third Mate noticed by Defendants for February 13, 2007 in Manila, Philippines on, among other grounds, that David T. Maloof, counsel for Plaintiffs, was scheduled to attend the burial of his father-in-law at Arlington National Cemetery in Arlington, Virginia on February 15, 2007. (See Letter from Thomas M. Eagan, one of Plaintiffs' counsel, to the Court, dated January 9, 2007, at 1-2.) Not accepting Mr. Maloof's representation, Mr. Cohen had his assistant verify whether Mr. Maloof's father-in-law was, in fact, being buried at Arlington National Cemetery and, if so, when. (See Declarations of Melissa W. Robinson dated January 10 and 17, 2007.)

[8] "Reply Mem." refers to the "Reply Memorandum of Law in Further Support of Plaintiff's Motion for Sanctions and to Amend Complaint," filed on June 8, 2007.  Exhibit 6 is a copy of the transcript of the teleconference on January 18, 2007. (See Dkt. No. 75.)

this history and insight with which the Court approaches the

latest dispute.


C.   Spoliation Of Evidence

On May 16, 2006, Plaintiffs served their First Request for

Production of Documents asking for, inter alia:

. . .

7.  Night Orders, Standing Orders, and any other documents
containing orders to the crew of the Vessel for the period
January 1, 2004 through December 31, 2005.

. . .

14. All documents pertaining to the weather on this Voyage,
including forecasts, weather reports, weather maps.

15. All documents pertaining to compliance with the
International Ship Management Code ("ISM Code") by the
Vessel . . . at all times during January 2004 through
December 2005 including . . . (e) plans for shipboard
operations (including special requirements for bad
weather), etc.

16. All documents . . . pertaining to the training of the
crew which served aboard the Vessel from February through
May, 2005, including but not limited to subjects such as
. . . (c) navigation in heavy weather . . . .

. . .

22. All communications pertaining to the Vessel, this
Voyage and/or the Cargo for the period between
January 1, 2005 to date between . . . (c) [Temm] . . .
(h) and the Vessel's agents at load and discharge ports
. . . .

23. Statements (oral and/or written) of the . . . managers
. . . pertaining to the Voyage at issue, damage to the
Vessel or it's Cargo.

. . .

34. All correspondence and communications between or among
any Defendant and its own agents or insurers concerning to
the Cargo and/or Vessel.

35. All correspondence and communications between any
Defendant, any other Defendant, or any other person or
entity concerning the Cargo and/or Vessel.

(Maloof 4/26/07 Ltr., Ex. 1.)[9]

On July 5, 2006, Sun Glory and the Vessel responded to

Plaintiffs' First Request for Production.[10]  With respect to

Request Number 7, they stated that "[o]n information and belief

the Night Orders [and] Standing Orders are on board the [V]essel

and in [the] custody of new owners." (Id. at 4.)  With respect

to Request Numbers 14, 15, 16, 22, 23, 34, and 35, they

responded by identifying certain documents in their production

and/or indicating that documents had been requested but were not

yet available. (Id. at 5-7, 10.)

On March 7, 2007, the deposition of Second Mate, Restituto

D. Badilla, Jr. (the "Second Mate"), was taken, and he testified

as follows about the retention of documents on the Vessel:

MR. MALOOF:  And what exactly did [the representative
from Temm] say?

SECOND MATE:  Just burn all the documents.

. . .

---

[9] "Maloof 4/26/07 Ltr." refers to the letter of Mr. Maloof to the Court,
including the exhibits appended thereto, dated April 26, 2007.

[10] On March 6, 2007, the Court simultaneously approved the dismissal of all
cross-claims in the action between the Defendants and the substitution of
Vandeventer Black LLP as counsel for SK Shipping. (See Dkt. Nos. 79-81.)

MR. MALOOF:  . . . [D]id you see the order being
carried out?

SECOND MATE:  Yes sir, I don't [sic] see the crew
burning but I heard the Captain ordered [sic] the
bosun.

. . .

MR. MALOOF: . . . [H]ow did you learn whether or not
the order to burn the books was carried out?

SECOND MATE:  As what I know the bosun and the crew
followed the order of the Captain.

MR. MALOOF:  How did you know that?

SECOND MATE:  The bosun told me.

(4/26/07 Maloof Ltr., Ex. 2 at 70/5-6, 71/2-5, 71/17-72/1.)

On April 30, 2007, the last day of fact discovery (see
Reply Mem., Ex. 6 at 39/4), during the deposition of Captain
Masato Suzuki, Temm's President, Mr. Cohen produced a memorandum
dated September 30, 2005 from Temm to the then-Master of the
Vessel in connection with the Vessel's sale to a third party.[11]
(5/17/07 Maloof Ltr., Ex. D (the "Document Retention Memo").)[12]
With respect to 27 categories of documents, the Document
Retention Memo instructed the Master of the Vessel "[t]o dispose

---

[11] According to Mr. Cohen, he "did not see [the Document Retention Memo] until
literally days before the deposition" of Captain Suzuki. (Tr. at 67/22-23.)
Mr. Cohen admitted that the Document Retention Memo "was going to be part of
[the Captain's] testimony" but, without explanation, chose not to provide it
to counsel for Plaintiffs until the deposition commenced. (Tr. at 68/6-10
("THE COURT:  And so you didn't give it to counsel ahead of time so counsel
could prepare?  MR. COHEN:  No, I did not give it to counsel ahead of time.
That is correct.  That is my fault, not the client's fault.").)

[12] "Maloof 5/17/07 Ltr." refers to Mr. Maloof's letter to the Court, including
the exhibits appended thereto, dated May 17, 2007.

[of them] by incinerator at the port after ships delivery or
[to] take them to shore for disposal." (Id. ¶ 3.)  With respect
to "[d]ocument[s] concerned[ing] [the] Sea Casualty on 20 March
2005 including Log book, ships report, communications, charts,
weather charts, video in computer CD. Etc.," the Document
Retention Memo instructed the Master "[t]o send [them] to
[Temm's] Office after the new [owners are] on board." (Id.
¶ 4(12).)

    Captain Suzuki testified at his deposition as follows with
respect to the implementation of the Document Retention Memo:

> MR. MALOOF:  As far as you're aware, were the . . .
> documents listed under number 3 disposed of by
> incineration on or about September 30, 2005?
>
> CAPTAINT SUZUKI:  This document is addressed to the
> vessel.  If the vessel listened to what is written and
> then followed accordingly, that was done the way it is
> written.
>
> MR. MALOOF:  The documents listed under number . . .
> 3, were copies of any of those documents maintained
> before they were destroyed?
>
> CAPTAIN SUZUKI:  Well, they were not needed.  That's
> why we disposed.  There were no copies.

(Opp'n Mem., Ex. 2 at 98/25-99/15 (emphasis added).)[13]

    As a result of the implementation of the Document Retention
Memo, it is undisputed that the following documents were not
produced by Defendants in this litigation:

---

[13] "Opp'n Mem." refers to the "Memorandum of Law in Opposition to Plaintiffs'
Motion for Sanctions," filed on June 8, 2007.

1.   The Vessel's Rough Sea Checklist 227 for the voyage in question.[14]

2.   All other Rough Sea Checklists for the Vessel's prior voyages.[15]

3.   Form 102-1 (Master's review record);[16]

4.   Form 112 (Drill and training);[17]

5.   Checklist 201 (Master's review);[18]

6.   Checklist 211 (Master's overall checklist);[19]

7.   Checklist 217 (Master's weekly inspection);[20]

8.   The Vessel's complete circular letter file;[21]

9.   Captain Fujimoto's circular letter file;[22] and

---

[14] See Opp'n Mem. at 7 ("The final item plaintiffs allege was destroyed to their detriment is the Rough Sea Checklist . . . [i]t is true that this was a document destroyed when the [V]essel was sold . . . .").

[15] See Tr. at 76/20-24 ("MR. COHEN:  Okay. All other rough sea checklists for its prior voyages.  THE COURT:  We agree not here.  MR. COHEN:  And no reason to anticipate that those would be required, your Honor . . . .").

[16] See 5/17/07 Maloof Ltr., Ex. D, ¶ 3(8).  Although the Court has viewed the record in the light most favorable to Defendants since this is Plaintiffs' motion, because Mr. Cohen did not address the whereabouts of this particular category of documents during oral argument, there is no disputed issue of fact as to their non-existence and/or non-production in this case.

[17] See 5/17/07 Maloof Ltr., Ex. D, ¶ 3(8).  See also supra note 16.

[18] See 5/17/07 Maloof Ltr., Ex. D, ¶ 3(12).  See also supra note 16.

[19] See 5/17/07 Maloof Ltr., Ex. D, ¶ 3(12).  See also supra note 16.

[20] See 5/17/07 Maloof Ltr., Ex. D, ¶ 3(12).  See also supra note 16.

[21] See Tr. at 81/23-82/12 ("MR. COHEN:  . . . I, frankly, don't know what those circular letters were but the fact of the matter is they went with the disposal of the documents prior to transfer of the [V]essel. THE COURT:  So we don't know what they are but we do know they went. MR. COHEN:  We do know they were on the list of September 2005 and they were not on the retained portion of the list.  That we know.").

[22] See Tr. at 82/13-14 ("MR. COHEN:  The same thing applies to the master's circular letter file.").

10. The Vessel's shore staff attendance record file.[23]

In addition, as a result of the sale of the Vessel to a third party, it is undisputed that the following documents were not produced by Defendants in this litigation:

1.  The Vessel's Passage Plan for the voyage in question.[24]

2.  The Vessel's Passage Plan for prior voyages.[25]

Finally, either as a result of the implementation of the Document Retention Memo, the sale of the Vessel to a third party, or otherwise, it is undisputed that the following documents were not produced by Defendants in this litigation:[26]

1.  Captain Fujimoto's Night Orders for the voyage in question.[27]

_____

[23] See Tr. at 82/19-21 ("MR. COHEN:  Vessel shore staff attendance record. Again, that was something on the vessel that was not delivered to the new owners.").

[24] See Opp'n Mem. at 4 ("[I]t was established on April 30 at the deposition of Captain Suzuki that this document was specifically ordered kept aboard the vessel at the sale . . . [i]ndeed, it is with the new owners who have refused to provide the document to Sun Glory.").

[25] See Tr. 77/5-7 ("THE COURT:  Passage plan prior voyages, we have discussed that, not here.  MR. COHEN:  Right.").

[26] Indeed, the only categories of documents for which the Court concludes that there is at least a disputed issue of fact as to whether Defendants satisfied their production obligation, concerns the documents used to evaluate Captain Fujimoto and the crew training manuals.  The deposition testimony discussed _infra_ at 17 demonstrates that Defendants at least produced the March 1, 2005 evaluation of Captain Fujimoto.  The Declaration of Captain Suzuki discussed _infra_ at 25-26 also demonstrates that Defendants have met their production obligation with respect to the crew training manuals.

[27] See Opp'n Mem. at 5 ("The [V]essel's Night Order Book is not listed for destruction in [the Document Retention Memo] nor is it specifically listed to remain on the [V]essel.  However, plaintiffs' own witness, Second Officer Badilla, testified at his deposition on March 7, 2007, that the Night Order Book remained on the [V]essel and was not burned or otherwise destroyed[.]"). In addition to Captain Fujimoto's Night Order Book, members of the crew
(continued on next page)

2.  Captain Fujimoto's Night Orders for prior voyages.[28]

3.  Captain Kohno's original evaluation of the Chief Mate.[29]

4.  Third Mate's navigation test.[30]

5.  Crew notebooks.[31]

D.  Rule 30(b)(6) Witness

On May 16, 2006, Plaintiffs served Defendants with a Notice of Deposition pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. (Cohen 12/18/06 Ltr., Ex. A (the "Original Notice").)[32]  Specifications Four and Five in the Original Notice, required Defendants to produce a witness with knowledge

---

(continued from prior page)
testified that he wrote night orders on scraps of paper and threw them away. (Reply Mem., Ex. 3 at 81/6-83/21 (Second Mate's Deposition).) id., Ex. 4 at 379 (Third Mate Robert Omlas' Deposition).)  For purposes of this motion, the relevant undisputed fact is that neither Captain Fujimoto's Night Order Book nor his miscellaneous night orders were produced by the Defendants.

[28] See Tr. 77/9-10 ("MR. COHEN:  This says night orders for prior voyages, same thing, no reason to anticipate that.").

[29] See Tr. 77/20-78/6 ("MR. COHEN:  A translation of Captain Kohno's evaluation, because apparently Captain Kohno did his evaluation in Japanese, was located and produced.  The form utilized, the Temm form utilized by Captain Kohno was not located or produced . . . .  We are going back beyond 18 months when we talk about the evaluation prior to the translated evaluation.").

[30] See Tr. 79/2-3 ("MR. COHEN:  The third party vendor did not retain a copy of the test.").

[31] See Tr. 55/15-20 ("MR. COHEN:  Let's talk about the crew notebooks.  There is testimony, deposition testimony, that the crew notebooks were not kept by every crew, that those notebooks contained, if they were done and they were not required to be done, they contained notes to be given to their replacement about things that they were doing in their job, deposition testimony.").

[32] "Cohen 12/18/06 Ltr." refers to Mr. Cohen's letter to the Court, including the exhibits appended thereto, dated December 18, 2006.

concerning "[t]he hiring, training and evaluation of the officers and crew who served about the M/V Maritime Antalya during February through May 2005" and the "[t]raining of the Vessel's officers and crew with respect to navigation and heavy weather," respectively. (Id. ¶¶ 4-5.)  On August 26, 2006, Defendants produced Captain Suzuki as their Rule 30(b)(6) witness on those specifications.

On September 27 2006, Plaintiffs served Defendants with a Supplemental Notice of Deposition regarding similar specifications to those described above in the Original Notice. (Maloof 12/13/06 Ltr., Ex. A, ¶¶ 2-4.)[33]  In addition, Plaintiffs demanded that Mr. Hamaguchi be produced as one of the witnesses. (Id. ¶ 1.)  On November 21, 2006, Plaintiffs notified Defendants that it was their position that a knowledgeable witness had not been produced concerning Temm's training and auditing of the Vessel, its Master, and crew. (5/17/07 Maloof Ltr., Ex. B at 2.)

On January 18, 2007, the Court held a teleconference covering several discovery disputes and issued several rulings. (Reply Mem., Ex. 6 (the "January 18, 2007 Discovery Order").) After discussing the November 21, 2006 letter and Defendants' compliance with their Rule 30(b)(6) obligations (id. at 14/22-21/21), the Court ordered Mr. Cohen to "figure out who [he] [is]

---

[33] "Maloof 12/13/06 Ltr." refers to Mr. Maloof's letter to the Court, including the exhibits appended thereto, dated December 13, 2006.

going to produce to answer these questions and others which were
unanswered (id. at 21/22-24).  On April 30, 2007, Defendants
again produced Captain Suzuki as the person designated to
testify under Rule 30(b)(6) concerning Temm's training and
auditing of the Vessel, its Master, and crew.

According to Plaintiffs, "[a]s in Guam [for the first Rule
30(b)(6) deposition], Captain Suzuki conceded that he had no
personal knowledge and in fact no real knowledge at all
concerning the most critical items of all, numbers 9, 10 and 11
from the [November 21, 2006] letter, concerning the most
critical issues: the manner in which (1) the [V]essel . . . and
(2) the [V]essel's master, Captain Fujimoto, had been audited by
Temm over the years." (Maloof 5/17/07 Ltr. at 2.)  Defendants
assert that Captain Suzuki was knowledgeable on the 11
categories in Plaintiffs' November 21, 2006 letter and chose to
submit "[a] copy of the entire transcript (rather than distorted
selections) . . . to demonstrate that Captain Suzuki provided
knowledgeable answers." (Opp'n Mem. at 2-3.)

Based on an independent review of Captain Suzuki's
deposition transcript, the pertinent testimony with regard to
Category 10 (viz., Mr. Hamaguchi's evaluation of Captain
Fujimoto), was the following:

MR. MALOOF:  Who did you speak to first on your staff
since the last deposition [on August 26, 2006]?

14

CAPTAIN SUZUKI:  Mr. Hamaguchi.  Mostly Mr. Hamaguchi.
He is the designated person who takes charge for
implementing our ISM manual.

. . .

MR. MALOOF:  Okay. Which [categories in the
November 21, 2006 letter] did Mr. Hamaguchi have
information on for you?

CAPTAIN SUZUKI:  No. 10, because Mr. Hamaguchi is
evaluating Captain Fujimoto.  Not only as a part of
the deposition, he have [sic] to evaluate the captain
. . . that is our ISM.

MR. COHEN:  He's in charge of that?

CAPTAIN SUZUKI:  Yes.

. . .

MR. MALOOF:  So from this list [of categories in the
November 21, 2006 letter], Mr. Hamaguchi had
knowledge, real knowledge of [categories] 9, 10, and
11?

CAPTAIN SUZUKI:  Yes.

MR. MALOOF:  When you say you discussed number 10, the
evaluation of Captain Fujimoto with Mr. Hamaguchi, how
long did you discuss that subject with him?

CAPTAIN SUZUKI:  I can't say exact time.  From time to
time.

MR. MALOOF:  Was it one meeting or more than one
meeting?

CAPTAIN SUZUKI:  More than one meeting.

. . .

MR. MALOOF:  What did you and Hamaguchi-san discuss
about how Mr. Hamaguchi evaluated Captain Fujimoto.
Not the amount of time now.  What did he actually tell
you about evaluating Captain Fujimoto?

. . .

15

CAPTAIN SUZUKI:  As far as I remember, Mr. Hamaguchi evaluate [sic] the Captain Fujimoto on our format. Our form.

MR. MALOOF:  Our form?

CAPTAIN SUZUKI:  Our form, yes.  Mostly they are 5, means excellent captain.  So, my evaluation to Captain Fujimoto is the same evaluation by Mr. Hamaguchi.

MR. MALOOF:  My question is a very kind of specific question, which is what did Mr. Hamaguchi tell you[?] What were his words to you about the evaluation of the captain?

CAPTAIN SUZUKI:  Very nice captain, very helpful captain.  Very trusted captain.

MR. MALOOF: Did he tell you anything else about how he evaluated -- how he went about his evaluation? Besides what you just said.  And he used a form.  I know he used a form.  Anything else?

CAPTAIN SUZUKI:  While we were talking about the evaluation [of] Captain Fujimoto, he said to me, yes, this is a number one captain of our many captains. So, how can I explain to you.  We needed this captain. The evaluation was the highest figure.

MR. COHEN:  What things did Mr. Hamaguchi use to reach the conclusion?  You are talking about the conclusion. Highest.  Mr. Maloof has asked you what details did Mr. Hamaguchi look at or utilize to reach that conclusion.

MR. MALOOF:  Actually I am asking you what he said to you about it.  I'm not asking you to tell me what he said, but what he specifically told you in these meetings in the office.  Was it detailed or no detail?

CAPTAIN SUZUKI:  Detail.  Of course detail.  But our understanding -- "our" -- meaning myself -- Mr. Hamaguchi's understanding for Captain Fujimoto: We need him, no doubt to evaluate him, but under our ISM manual we have to evaluate.  But actually, not necessary to evaluate Captain Fujimoto, because as I told you, he was in the office.  We know him, his ability, his skill.  His character.  Everything.

. . .

MR. MALOOF:  Did you discuss with Mr. Hamaguchi how he evaluated the captain's night order book entries. Number 5.

CAPTAIN SUZUKI:  Yes, last sentence, night order book entries.  I didn't discuss everything.   The total, how do I say in general.

MR. MALOOF:  You just discussed the general?

CAPTAIN SUZUKI:  Yes.

MR. MALOOF:  You didn't discuss these different categories?

CAPTAIN SUZUKI:  One by one.

MR. MALOOF:  When you say "one by one" you mean you did not discuss them one by one; is that correct?

CAPTAIN SUZUKI:  No.

MR. MALOOF:  I mean personality, sense of responsibility awareness, all those.

CAPTAIN SUZUKI:  No . . . .

MR. MALOOF: . . . I'm not asking you for the answer of what was put on the form and why.  Right now I'm asking you which of these subjects did you specifically discuss with Mr. Hamaguchi between your deposition and today from this list on the first page of [the March 1, 2005 evaluation form for Captain Fujimoto].  Which subjects did you discuss with Mr. Hamaguchi?
. . .

CAPTAIN SUZUKI:  From the deposition in Guam until now.

MR. MALOOF:  Yes.

CAPTAIN SUZUKI:  No, not specific subjects.

MR. MALOOF:  You said for some of these -- when this was originally filled in, did you have some input?

17

. . .

CAPTAIN SUZUKI:  As far as I told you, when he
evaluate [sic] Captain Fujimoto, some items he
consulted with me.

MR. MALOOF:  Which items from this list for the March
evaluation did he consult with you?

. . .

CAPTAIN SUZUKI:  . . . As far as I remember, the
reliability from crew.

MR. MALOOF:  That was the only one?

CAPTAIN SUZUKI:  As far as I remember only one here.
The other items I don't remember clearly.

. . .

MR. MALOOF:  When this was filled in on March 1, 2005,
we know Mr. Hamaguchi spoke to you about the
reliability.  Did he do anything else?  Do you know if
he did anything else to prepare this form?  Any other
investigation?

CAPTAIN SUZUKI:  No.  No investigation.

MR. MALOOF:  There are other forms attached.  One is
October 1, 2004.  The next page.  The next one is
October 1, 2003.  It looks like you have one each
year.  You only do the master one time per year?

CAPTAIN SUZUKI:  Yes.

. . .

MR. MALOOF:  . . .  Do you know if Mr. Hamaguchi ever
visited the vessel and met with the crew or talked to
the crew to fill out these forms?  Do you know for
sure?

CAPTAIN SUZUKI:  I don't know.  I don't remember.

(Opp'n Mem., Ex. 2 at 10/24-11/4, 15/23-16/6, 16/17-17/5,

18/4-8, 18/13-20/9, 21/24-23/14, 23/18-23, 24/2-6,

24/15-19, 25/16-26/3, 27/17-21.)

Based on an independent review of Captain Suzuki's deposition transcript, the pertinent testimony with regard to Category 11 (viz., Mr. Hamaguchi's audits of the Vessel), was the following:

> MR. MALOOF:  Was there anything else? [I]n the meetings you had with Mr. Hamaguchi, after your last deposition [on August 26, 2006], until today, was there anything else specific that you discussed concerning the MARITIME ANTALYA?
>
> . . .
>
> CAPTAIN SUZUKI:  Only general.  No specific subjects MARITIME ANTALYA.
>
> . . .
>
> MR. MALOOF:  Who did the annual audit of the vessel for Temm?
>
> MR. COHEN:  The MARITIME ANTALYA.
>
> CAPTAIN SUZUKI:  Mr. Hamaguchi.  Captain Fujimoto also audited the MARITIME ANTALYA while he was in our office.
>
> . . .
>
> MR. MALOOF:  Le me show you Exhibit 42?  Mr. Suzuki, is Exhibit 42, is that the ship audit document that Temm filled out for the MARITIME ANTALYA in 2004?
>
> . . .
>
> CAPTAIN SUZUKI: Yes.
>
> MR. MALOOF:  That was filled out by -- that auditor there is Captain Fujimoto.  Do you see that on the first page?
>
> CAPTAIN SUZUKI: Yes.
>
> . . .

MR. MALOOF:  . . . Let me show the witness a document previously marked as Exhibit 162.  Heavy Weather checklists.  Are you familiar with that document, Mr. Suzuki?

. . .

CAPTAIN SUZUKI:  I know this form, yes.

MR. MALOOF:  Do you know if any audit was ever conducted of the MARITIME ANTALYA to determine if this form was being properly filled in for heavy weather?

CAPTAIN SUZUKI:  I don't know . . . .

. . .

MR. MALOOF:  If this was being filled in by the vessel, do you know why we don't have any?  None of these have been produced in the litigation.  Do you know what happened to those forms if they were being filled in?

CAPTAIN SUZUKI:  I can't understand.

MR. MALOOF:  You say it's your belief these were being filled in on the vessel when the vessel was in rough seas.  Where are the forms today that were filled in on the vessel?

CAPTAIN SUZUKI:  Where is this form?

MR. MALOOF:  The filled-in ones.  We just have blanks.

CAPTAIN SUZUKI:  I don't know.

MR. MALOOF:  Do you know whether, when Captain Fujimoto audited the vessel in 2004, he specifically checked whether form 227 was being filled in?

CAPTAIN SUZUKI:  I don't know.  But I suppose.

MR. MALOOF:  I am not asking you to guess.  I'm asking if you know for sure.

CAPTAIN SUZUKI:  I don't know.

(Opp'n Mem., Ex. 2 at 28/16-20, 28/23-24, 30/13-18, 31/22-25, 32/5-9, 45/11-14, 45/17-22, 46/21-47/18.)

At oral argument, Mr. Cohen conceded that even after Captain Suzuki spoke to Mr. Hamaguchi, Captain Suzuki could not testify in any specificity or detail about how Mr. Hamaguchi evaluated Captain Fujimoto. (Tr. 104/7-12.) Similarly, Mr. Cohen conceded that Captain Suzuki could not testify in any specificity or detail about how the Vessel was audited. (Tr. 106/9-107/8.)

On July 30, 2007, Defendants submitted a declaration by Captain Suzuki dated the same day "on various issues, but particularly in connection with the search for documents." (7/30/07 Cohen Spoliation Ltr. at 1.)[34]  Regarding the extent of his preparation in advance of his second Rule 30(b)(6) deposition he declared as follows:

> 14.  In preparing for the deposition on April 30, 2007 as the designated representative of Sun Glory Maritime Co. Ltd. I prepared myself to answer the 11 questions requested by the Court by speaking with individuals within Temm, including Mr. Hamaguchi, as well as persons from Top Ever so that I could respond to questions on those subjects.  I conducted these interviews over a period of time and in multiple conversations.  I obtained from the persons I spoke with the information they themselves had on the subjects.

(Suzuki Decl. ¶ 14.)

---

[34] "Cohen 7/30/07 Spoliation Ltr." refers to Mr. Cohen's letter to the Court, including the exhibits attached thereto, dated July 30, 2007.  Captain Suzuki's Declaration was attached as Exhibit A.

E.   Location Of Crew Training Or Evaluation Documents

On December 13, 2006, Plaintiffs wrote Defendants regarding the sufficiency of their document production concerning certain categories of documents as follows:

1.   Documents used to evaluate the competency of the Master.

2.   All evaluations of Chief Mate Espere prior to this voyage. Only some have been produced. No evaluations by the prior Master (Capt. Kohno) have been produced. These evaluations are required to be done quarterly, as per the ISM code. Although Sun Glory produced a letter from Capt. Kohno which was highly critical of Chief Mate Espere, not a single formal evaluation by Capt. Kohno has been produced.

3.   The questions and answers to the navigation test given to Third Mate. Even if in the hands of the contractor administering the test, it is surely under the control of Sun Glory/Temm.

4.   Cover to cover crew training manuals.

(4/26/07 Maloof Ltr., Ex. 10 at 2.)  In the January 18, 2007 Discovery Order, the Court instructed Defendants "to do either a proper response where somebody swears that they've searched and the documents are gone and whatever else the instructions require, or produce them." (Reply Mem., Ex. 6 at 24/25-25/3.) Mr. Cohen responded that he will "get the affidavit out." (Id. at 25/4.)  The Court engaged in the following colloquy to ensure that its ruling was clear and unambiguous:

THE COURT:  Mr. Cohen, why don't we just move on.  You understand that your client is required to give a proper Rule 34 response to counsel's Rule 34 request; a response as to each category of documents, one

through four, set out on page two of Mr. Maloof's
December 13 letter, right?  You know they have to do
that?

MR. COHEN:  Yes, your Honor.

THE COURT:  And you'll do it?

MR. COHEN:  Yes, your Honor.

(Id. at 26/17-25.)

Defendants never submitted an affidavit to comply with the
January 18, 2007 Discovery Order.  Nevertheless, they contend
that they complied with the January 18, 2007 Discovery Order
because, on April 30, 2007, the last day of fact discovery,
"Captain Suzuki was brought in person to respond to these
document categories and give plaintiffs' counsel sworn
responses" and he "testified explicitly . . . regarding his
efforts to locate documents." (Opp'n Mem. at 3 (citing Ex. 2 at
206-10).)  At oral argument, Mr. Cohen stated that the
January 18, 2007 Discovery Order "does not use the term
affidavit" and Captain Suzuki stated that "he had produced all
of the documents that were within the owner's and his possession
and control." (Tr. 72/12-13, 73/9-11.)

With respect to the whereabouts of evaluations of First
Mate Diosado Espere, Jr. (the "Chief Mate") prior to this voyage
by Captain Kohno, Captain Suzuki testified as follows:

MR. COHEN:  Have you been able to locate [the
evaluation report of the Chief Mate by Captain Kohno]
since the date of the communication, April 26, 2007?

23

CAPTAIN SUZUKI:  No. We couldn't find.

MR. COHEN:  Is it your testimony that you have made all efforts to locate this document.

CAPTAIN SUZUKI:  Yes.

(Opp'n Mem., Ex. 2 at 207/14-20.)

With respect to the whereabouts of the navigation test given to Third Mate, Robert Omlas (the "Third Mate"), Captain Suzuki testified as follows:

MR. COHEN:  Earlier today we referred to a test taken by Third Officer Omlas prior to his being hired by Topever for Temm.  And a portion of that test appears to be missing from the documents.  Have you made attempts to determine the location of the missing portion of the test?

CAPTAIN SUZUKI:  Yes, I did.

MR. COHEN:  Would you tell us what efforts you made to attempt to locate that particular document.

CAPTAIN SUZUKI:  First, I ordered the staff members of Topever who handled that type of document[] to look for the document.

MR. COHEN:  What responses did you get from the staff in your office and staff in Topever?

CAPTAIN SUZUKI:  They looked for the document, but they couldn't find it.

(Id. at 209/25-210/20.)

With respect to the whereabouts of documents used to evaluate the competency of the Master and the crew training manuals, Captain Suzuki's testimony at the pages cited by Defendants is silent on those two issues.

24

Based on Captain Suzuki's above testimony, the Court remarked at oral argument that it did not "recall his testimony as having been that specific and . . . having extended to each of the categories of documents" (Tr. 73/12-14).  In response, Mr. Cohen stated that he "will provide a supplemental affidavit." (Tr. 74/10.)  In his post-oral argument declaration, Captain Suzuki made the following statements with respect to the search for unaccounted for documents:

> 10.  Upon receiving the document requests I caused my staff to perform a search of all Temm files and Sun Glory Maritime files for the requested documents.  In addition I contacted Sojitz Marine & Engineering, provided them with the lists of requested documents and requested them to provide me any of the requested documents within their possession or control.  In addition I contacted Topever Marine in Manila, who acted as manning agents for crew for Temm and provided them the list of requested documents and advised them that I required any of the requested documents within their possession or control.  In addition to these activities I contacted the then Master of the Vessel, Captain Fujimoto, who remains an employee of Temm, provided him a list of requested documents and asked him to provide me with any additional documents on the list that he had not already provided to Temm.

> 11.  In carrying out the search of my office files and those of the Vessel owner not only did I personally conduct a search but the search was also undertaken by Ms. Hiroko Yasunaga, Ms. Junko Doi, and Ms. Kazue Nakanishi who reported their findings to me.  The search was not only conducted of hard copy files but of computer records.  I personally spoke with senior management of Top Ever regarding the production of the required documentation but I explained the importance of making extended file searches.  The files of Top Ever were searched by Engineer Nestor G. Alilin, Ms. Geraldine C. Ochate, Ms. Lilivic I. Pagcaliwagan, and Ms. April F. Fornal and I personally interviewed these

individuals and was advised that they had produced all
documents that were in Top Ever's possession or
control.

. . .

13.  I am advised that there is confusion regarding
whether there were crew training manuals provided by
Temm to Top Ever to be used in shore-side instruction
of the crew . . . .  [T]he crew receiv[ed] briefings
from copies of the ISM manuals aboard the vessel that
were provided to Top Ever by Temm.  These Manuals were
all provided to Vessel's counsel and, I understand
given to plaintiffs' counsel . . . .  I believe
plaintiffs' counsel has misunderstood.  There are no
crew training manuals separate from the ISM manuals
carried aboard the [V]essel.  The copies of these
manuals are the exact same as those that were on board
the [V]essel in September 2005 . . . .

. . .

15.  . . . I further affirm that I am fully convinced
that I have supplied or caused to be supplied all of
the documents requested that were in possession or
control of Sun Glory, Temm, Top Ever or Sojitz Marine
& Engineering that were in existence and further that
no documents pertaining to the subject of this lawsuit
were ever intentionally destroyed to avoid their
production in this lawsuit.

(Suzuki Decl. ¶¶ 10-11, 13, 15.)  In their response to

Defendants' post-oral argument submissions on this topic,

Plaintiffs did not address the sufficiency of Captain Suzuki's

Declaration with respect to the four categories of documents

identified in their December 13, 2006 letter. (See generally

8/10/07 Eagan Ltr. at 2-3.)[35]

---

[35] "8/10/07 Eagan Ltr." refers to the letter from Mr. Eagan to the Court,
dated August 10, 2007.

F.   <u>Solicitation Of False Evidence</u>

On November 29, 2005, the Second Mate signed an affidavit that discussed, <u>inter alia</u>, the weather conditions during the storm on or about March 18-20, 2005 that resulted in the cargo damage.  Based on that affidavit, at his March 7, 2007 deposition, the Second Mate testified that the Vessel's log book entries during the period in question were not accurate:

> MR. MALOOF:  Now, you mentioned in your affidavit, turning to paragraph 10, you say: "In the morning of March 19th, the vessel experienced SW winds Force 7 to 8 i.e., actually Force 6 to 7."  Now, when you say Force 7 to 8 versus actually Force 6 to 7, why are you saying that?
>
> SECOND MATE:  Because there is a standing order, came from the Captain that to add 1 or 2 Beaufort scale to the actual observed.
>
> MR. MALOOF:  His standing order was you were to increase the Beaufort scale when you put them in the log book from what the weather actually was?
>
> . . .
>
> SECOND MATE:  Yes, sir.
>
> . . .
>
> MR. MALOOF:  Okay. Now you got that standing order. How did you receive that standing order?
>
> SECOND MATE:  It's only verbal from Third Mate.
>
> . . .
>
> MR. MALOOF:  . . . [A]s far as March 18th, 19th, and 20th, the worst weather was what was recorded in the Deck Log Book you were referring to in paragraph 12, is that right?
>
> SECOND MATE:  Yes, sir.

MR. MALOOF:  Okay. And you say the Deck Log Book said Force 10 but it was actually Force 8 to 9, is that correct?

SECOND MATE:  Yes, sir, because we add 1 or 2 scales.

(4/26/07 Maloof Ltr., Ex. 2 at 20/18-21/4, 21/8, 21/15-17, 23/12-20.)  In addition, the Second Mate produced for the first time during his deposition a copy of an unsigned affidavit (the "Recantation Affidavit") in his name that provided in pertinent part:

    . . .

    3.  That I signed the [November 29, 2005] affidavit without reading its content and without knowing the purpose for which it will be consumed [sic];

    4.  That it was only now that I discovered and knew that most of the articulations were not true but mere statements resulting to misrepresentations; and

    5.  That I am voluntarily executing this affidavit to invalidate and revoke the said affidavit dated November 29, 2005 which I signed without due care and understanding.

(4/26/07 Maloof Ltr., Ex. 4.)  The Second Mate testified at his deposition as follows with respect to the Recantation Affidavit:

    MR. MALOOF:  Now, Mister Badilla, this is the document that you actually provided to us, correct?

    SECOND MATE:  Yes, sir.

    MR. MALOOF:  And how did you get a copy of this?

    SECOND MATE:  Top Ever sent me by fax when I was on board the vessel Senwasan.

MR. MALOOF:  Okay.  And did you sign this, this new
affidavit?

SECOND MATE:  No, sir.

MR. MALOOF:  Why didn't you sign it?

SECOND MATE:  Because upon reading this affidavit the
contends of this one is not true.

MR. MALOOF:  The things which are stated in this
affidavit, that you never read the prior affidavit,
you did not know its purpose, that the prior affidavit
was untrue, that you read without due care and
understanding, that Mister Sawatane presented himself
as an insurance writer, did you tell any of these
things to Top Ever or Temm or they just wrote these
down?

SECOND MATE:  No, sir.

.  .  .

MR. MALOOF:  Now, my question, did you ever say those
things to anybody?

SECOND MATE:  No, sir.

(4/26/07 Maloof Ltr., Ex. B at 37/2-17, 37/21-38/1.)

On April 30, 2007, Captain Suzuki testified at his

deposition as follows on the subject of the Recantation

Affidavit:

MR. MALOOF:  Let me show you a document previously
marked as Exhibit 156 [i.e., the Recantation
Affidavit].  When was the first time you saw that
document?

.  .  .

CAPTAIN SUZUKI:  I saw this once.

MR. MALOOF:  When was the first time you saw it?

CAPTAIN SUZUKI:  After the accident.  But I don't
remember when exactly.

MR. MALOOF:  Did Temm send that document to Second
Mate Badilla?

CAPTAIN SUZUKI:  No.

MR. MALOOF:  How did you come to see that document?

CAPTAIN SUZUKI:  Maybe this from P&I club or main
manager.

MR. MALOOF:  From Sojitz?

CAPTAIN SUZUKI:  Sojitz.

MR. MALOOF:  They sent that to you?

CAPTAIN SUZUKI:  I don't know whether it was addressed
to the company or me.  I don't know whether it was to
attention of me or to the company.  I don't remember
which.

MR. MALOOF:  Did anyone call you to discuss that
document with you?

CAPTAIN SUZUKI:  No.

MR. MALOOF:  When they sent the documents to you, did
they include any e-mail or communication explaining
it?  It was just sent like that, like a piece of
paper?

CAPTAIN SUZUKI:  Can't imagine that this came alone,
but I don't remember.

. . .

MR. MALOOF:  Do you know if it came with an e-mail or
fax cover sheet or a letter?

CAPTAIN SUZUKI:  I don't remember whether it was fax
or a letter.

MR. MALOOF:  Did you do anything with the document
once you got it?

CAPTAIN SUZUKI:  This is probably emphasize --
probably what happened is this was sent to Topever.

MR. MALOOF:  By you?

CAPTAIN SUZUKI:  Can I just digress a little bit?  I'm the president of the company.  So I ask my subordinate to send it or some kind of given instruction.  I personally didn't send it to Topever.

MR. MALOOF:  When you sent it to Topever, what instruction did you give to Topever, meaning your company.  What instruction did your company give Topever with that document?

CAPTAIN SUZUKI:  Well, most likely it was that came, and I don't remember whether the second mate was still with us at that time or not.  I don't think there was any specific instruction that I recall that I gave.  Well, to answer your question this is just a cover, so this was not the only page, right?

. . .

MR. MALOOF:  You tell me.  Does it indicate it was either sent or received by Temm?  At the top.  By fax.

CAPTAIN SUZUKI:  In our company, when we send this there is no record.  So, looks like we received this.

MR. MALOOF:  By fax?

CAPTAIN SUZUKI:  By fax.

MR. MALOOF:  You believe you forwarded it to Topever?

CAPTAIN SUZUKI:  In my position, it was my sense that any information regarding the crew was very important.  So a hundred percent certainty I think that was sent to Topever.

. . .

MR. MALOOF:  Did you send this to Topever and in words or substance ask them to try and get it signed by Mr. Badilla to help your case?

CAPTAIN SUZUKI:  (In English) I don't know.

THE INTERPRETER:  I don't remember.

. . .

31

MR. MALOOF:  At any time did you have any information from anyone as to whether the statement which was to be signed under oath was true or false?

. . .

CAPTAIN SUZUKI:  If you are asking me whether the statements which are written here are true or false, I don't know.

MR. MALOOF:  I'm actually asking something slightly different, which is whether you had any information about that.

CAPTAIN SUZUKI:  As far as I can remember, no.

. . .

MR. MALOOF:  Did you ever call Second Mate Badilla and ask him if this statement which you believed was automatically sent by your staff to Topever was true or false?

CAPTAIN SUZUKI:  No, I did not.

(Opp'n Mem., Ex. 2 at 116/7-9, 116/14-117/16, 117/24-118/25, 119/21, 121/5-9, 121/20-23, 122/7-13, 123/4-8.)

At oral argument, the following colloquy took place regarding the fact and circumstances surrounding the Recantation Affidavit:

THE COURT:  So what do you say I make of this [Recantation] [A]ffidavit just floating in space out there?  We don't quite know who it came from or what cover letter came with it.  We have the witness opining that it must have come with some kind of cover.  What am I to make of that?  Am I not allowed to consider that?

MR. COHEN:  Your Honor, I am not saying you are not allowed to consider it.  I am simply saying, number one, the [Recantation] [A]ffidavit wasn't signed.

THE COURT:  I have that part.

MR. COHEN:  And the witness disagreed with what was in
it and didn't sign it.  This happens every day.  You
take down the facts as you understand them or one
takes down the facts as one understands them.  One
presents an affidavit.

THE COURT:  One doesn't often, however, see an
affidavit recanting a prior affidavit just floating
along out there and being sent to the witness who had
executed the prior affidavit. One doesn't see that
every day.

MR. COHEN:  I would agree with you on that.

THE COURT:  I find it passing strange.

MR. COHEN: Nevertheless the witness disagreed with the
contents of the [Recantation] [A]ffidavit and refused
to sign it.

THE COURT:  It seems to have been -- well, counsel
characterizes the sequence of events as the
recantations having been solicited by the defense
side.

MR. COHEN:  I understand the characterization, your
Honor.

THE COURT:  What do you say to it?

MR. COHEN:  I say to it that the document was
definitely asking for assistance for the defense side
and I don't make any excuse for that.  If Mr. Badilla
disagreed with the characterization of the facts, he
would not sign it.  The fact is he didn't sign it.  He
disagreed with the characterization of the facts.
There is no evidence, there is no allegation that he
was in some way coerced or threatened.

THE COURT:  What about the word solicited?  You will
accept that, right?  Certainly he was solicited to
change his testimony.

MR. COHEN:  He was provided with a document, I agree.

. . .

THE COURT:  . . . How come that [R]ecantation
[A]ffidavit, never signed, was never produced?

33

MR. COHEN:  There is no explanation for it, your
Honor.  It did not come out of the discovery
documentation that I received from Temm as a
representative of Sun Glory.

MR. MALOOF:  Can I ask a question on that point? I
would like to know how it was created if Mr. Cohen
knows.

THE COURT:  Do we have any information on how it was
created, counsel?

MR. COHEN:  We do.  It's privileged.

THE COURT:  All right.

MR. COHEN:  I will be happy to share that with the
court in camera.

(Tr. 63/8-64/25, 71/5-17.)  On July 26, 2007, Mr. Cohen

submitted a declaration in camera regarding the facts and

circumstances surrounding the creation of the Recantation

Affidavit (the "Cohen Recantation Affidavit Declaration").


G.   Heavy Weather Defense Contention Interrogatory

On November 29, 2006, Plaintiff served Defendants with

Plaintiffs' First Request for Admissions, Document Request, and

Contention Interrogatories. (Maloof 4/26/07 Ltr., Ex. 11.)

Contention Interrogatory Number Two requested Defendants to

do the following:

        (a)  [i]dentify each of the defenses, if any, which
             you contend exonerate Defendant[s], in whole or
             in part, from liability and further[;]

        (b)  for each defense, identify the facts which you
             contend support those defenses; and

> (c)  for each defense, identify the witnesses and
>      documents which you contend support those
>      defenses.

(<u>Id.</u> at 16.)

In the January 18, 2007 Discovery Order, the Court
overruled Defendants' objection to responding to Plaintiffs'
contention interrogatories on the ground that they were
premature when fact discovery was set to close at that time on
March 30, 2007. (Reply Mem., Ex. 6 at 33/5-36/25.)  On
February 15, 2007, Defendants served their Response to
Plaintiffs' Contention Interrogatories. (Maloof 4/26/07 Ltr.,
Ex. 12.)  As to Contention Interrogatory Number Two, Defendants
responded as follows:

> (a)  [i]dentify each of the defenses, if any, which you
>      contend exonerate Defendant[s], in whole or in
>      part, from liability and further[;]
>
> **RESPONSE:** Act of God; perils dangers and
> accidents of the seas . . . .
>
> (b)  for each defense, identify the facts which you
>      contend support those defenses; and
>
> **RESPONSE:** Rare and highly unusual storm at sea
> for the area and time, which could not be
> reasonably anticipated causing phenomenal winds
> and waves which could not be overcome by
> reasonable human efforts.
>
> (c)  for each defense, identify the witnesses and
>      documents which you contend support those
>      defenses.
>
> **RESPONSE:** Discovery is on-going and witnesses and
> documents have not been fully identified at this time.

(<u>Id.</u> at 2.)

35

As noted above, the January 18, 2007 Discovery Order extended fact discovery one month from March 30, 2007 to April 30, 2007. (Reply Mem., Ex. 6 at 39/4.)  In addition, May 15, 2007 was the deadline set by the Court for the submission of damages expert reports. (5/17/07 Maloof Ltr., Ex. A.)  On May 25, 2007, Defendants served their Supplemental Response to Plaintiffs' Contention Interrogatories. (Opp'n Mem, Ex. 3.)  As to Contention Interrogatory Number Two, Defendants identified ten witnesses and over 30 documents in support of their defenses. (Id. at 1-2.)


H.    Expert Report On Mitigation Of Damages Defense

On January 24, 2007, the Court entered the parties' stipulated schedule for the submission of damages' expert reports. (5/17/07 Maloof Ltr., Ex. A.)  On May 15, 2007, "Plaintiffs' expert disclosure re prima facie damages" and "Defendants' expert disclosure on mitigation" were to be exchanged. (Id.)  On June 15, 2007, "[r]esponsive damages expert reports" were due. (Id.)  On July 1, 2007, "rebuttal expert reports" were due. (Id.)

On May 15, 2007, no party exchanged a damages expert report. (Opp'n Mem. at 2 ("Defendants chose, as they were entitled to, not to submit any expert disclosure on mitigation

of damages.").)  On June 15, 2007, Plaintiffs served their
damages expert report regarding mitigation of damages.  On
July 1, 2007, Defendants submitted their damages expert report
on that topic.


DISCUSSION

A.   Legal Standards Applicable to Discovery Sanctions

        The Court of Appeals has held that a district court has
broad authority to impose sanctions on a party for discovery
misconduct under its inherent power to manage its own affairs or
under Rule 37 of the Federal Rules of Civil Procedure. See,
e.g., Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d
99, 106-07 (2d Cir. 2002) (citing, inter alia, Chambers v.
NASCO, Inc., 501 U.S. 32, 46 (1991) (rejecting the argument
that, inter alia, Rule 37 displaced a court's inherent power to
impose sanctions for bad-faith conduct)).

        i.   Inherent Power

        "When a district court invokes its inherent power to impose
attorney's fees or to punish behavior by an attorney in 'the
actions that led to the lawsuit . . . [or] conduct of the
litigation,' which actions are taken on behalf of a client, the
district court must make an explicit finding of bad faith."
United States v. Seltzer, 227 F.3d 36, 41 (2d Cir. 2000)
(quoting Hall v. Cole, 412 U.S. 1, 15 (1973) and citing

37

Chambers, 501 U.S. at 50). See also DLC Mgmt. Corp. v. Town of
Hyde Park, 163 F.3d 124, 136 (2d Cir. 1998).

    ii.  Rule 37

    Rule 37 provides the procedures for enforcing discovery
obligations and sanctioning any misconduct concerning those
obligations.  "Numerous factors are relevant to a district
court's exercise of its broad discretion to order sanctions
under Rule 37, including (1) the willfulness of the non-
compliant party or the reason for the noncompliance; (2) the
efficacy of lesser sanctions; (3) the duration of the period of
noncompliance, and (4) whether the non-compliant party had been
warned of the consequences of his non-compliance." Nieves v.
City of New York, 208 F.R.D. 531, 535 (S.D.N.Y. 2002) (citing
Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 852-54 (2d
Cir. 1995)).  "Dismissal under Rule 37 is an extreme sanction,
to be imposed only in extreme circumstances." Jones v. Niagara
Frontier Transp. Auth., 836 F.2d 731, 734 (2d Cir. 1987).
Accordingly, "[t]he sanction of dismissal should not be imposed
under Rule 37 unless the failure to comply with a pretrial
production order is due to 'willfulness, bad faith, or any
fault' of the deponent.'" Shcherbakovskiy v. Da Capo Al Fine,
Ltd., 490 F.3d 130, 135 (2d Cir. 2007) (quoting Salahuddin v.
Harris, 782 F.2d 1127, 1132 (2d Cir. 1986) (quoting Societe
Internationale Pour Participations Industrielles et Commerciales

v. Rogers, 357 U.S. 197, 212 (1958)).  In considering this

motion, I am mindful of my colleague Judge Alvin K.

Hellerstein's recent statement that "[d]iscovery is run largely

by attorneys, and the court and the judicial process depend upon

honesty and fair dealing among attorneys." In re September 11th

Liability Ins. Coverage Cases, 243 F. Supp. 2d. 114, 125

(S.D.N.Y. 2007).


B.   Legal Standard for Spoliation Of Evidence

     "Spoliation is the destruction or significant alteration of

evidence, or the failure to preserve property for another's use

as evidence in pending or reasonably foreseeable litigation."

West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir.

1999).  In determining the appropriate sanction for spoliation

of evidence, the Court of Appeals has explained that "[t]he

sanction should be designed to: (1) deter parties from engaging

in spoliation; (2) place the risk of an erroneous judgment on

the party who wrongfully created the risk; and (3) restore 'the

prejudiced party to the same position he would have been in

absent the wrongful destruction of evidence by the opposing

party.'" Id. (quoting Kronisch v. United States, 150 F.3d 112,

126 (2d Cir. 1998)).

     "Where, as here, the nature of [one of] the alleged

breach[es] of a discovery obligation is the non-production of

evidence, a district court has broad discretion in fashioning an appropriate sanction, including the discretion to delay the start of a trial (at the expense of the party that breached its obligation), to declare a mistrial if trial has already commenced, or to proceed with a trial and give an adverse inference instruction." Residential Funding, 306 F.3d at 107; see also Kronisch, 150 F.3d at 126 ("It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.") (citations omitted)).  "[A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Residential Funding, 306 F.3d at 107 (quoting Byrnie v. Town of Cromwell, 243 F.3d 93, 107-12 (2d Cir. 2001)).

With respect to the first factor for an adverse inference, the Court of Appeals has held that "[t]he obligation to preserve evidence arises when the party has notice that the evidence is

relevant to litigation or when a party should have known that
the evidence may be relevant to future litigation." Fujitsu Ltd.
v. Federal Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001) (citing
Kronisch, 150 F.3d at 126)).  Pursuant to this obligation,
"anyone who anticipates being a party or is a party to a lawsuit
must not destroy unique, relevant evidence that might be useful
to an adversary." Zubulake v. UBS Warburg LLC, 220 F.R.D. 212,
217 (S.D.N.Y. 2003).  "'While a litigant is under no duty to
keep or retain every document in its possession . . . it is
under a duty to preserve what it knows, or reasonably should
know, is relevant in the action, is reasonably calculated to
lead to the discovery of admissible evidence, is reasonably
likely to be requested during discovery and/or is the subject of
a pending discovery request.'" Id. (quoting Turner v. Hudson
Transit Lines, Inc., 142 F.R.D. 68, 72 (S.D.N.Y. 1991)).

     With respect to the second factor for an adverse inference,
"[i]n this circuit, a 'culpable state of mind' . . . includes
ordinary negligence." Zubulake v. UBS Warburg LLC, 229 F.R.D.
422, 431 (S.D.N.Y. 2004) (quoting Residential Funding, 306 F.3d
at 108)).

     With respect to the third factor for an adverse inference,
the Court of Appeals has held that for the destroyed evidence to
be "relevant" it must be "more than sufficiently probative to
satisfy Rule 401 of the Federal Rules of Evidence." Residential

Funding, 306 F.3d at 108-09.  "Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.'" Id. (quoting Kronisch, 150 F.3d at 127).  "When evidence is destroyed in bad faith (i.e., intentionally or willfully), that fact alone is sufficient to demonstrate relevance." Zubulake, 229 F.R.D. at 431 (citing Residential Funding, 306 F.3d at 109)).  "Similarly, a showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party." Residential Funding, 306 F.3d at 109 (citation omitted).  "By contrast, when the destruction is negligent, relevance must be proven by the party seeking the sanctions." Zubulake, 229 F.R.D. at 431 (citing Residential Funding, 306 F.3d at 109)).

C.   Application to the Spoliation Claim

        Defendants contend that the sanction of a default judgment is inappropriate where, as here, Plaintiffs were "provided a full opportunity to inspect the items and copy any file aboard the Vessel under the April 20, 2005 Order of Judge Yuko Hama of the Fukuyama Chapter, The Hiroshima District Court, Japan."

(Opp'n Mem. at 10; see also, e.g., Tr. 76/23-77/1 ("MR. COHEN:
And no reason to anticipate [that the Rough Sea Checklists for
the Vessel's prior voyages] would be required, your Honor, when
the [V]essel was boarded by the Japanese lawyer who could have
looked at all of them on the [V]essel.  He didn't think they
were important.").)  In addition, they note that the Document
Retention Memo was dated September 30, 2005, before the instant
lawsuit was commenced on March 15, 2006. (Opp'n Mem. at 6.)
Defendants also assert that Plaintiffs have not satisfied the
three-prong test for an adverse inference instruction for
spoliation of evidence. (Id. at 9-10.)  Finally, assuming the
Court were to impose the sanction of an adverse inference,
Defendants contend that "[a]t most, Plaintiffs are entitled to
an adverse inference that production of the materials would be
detrimental to the Defendants' case."  (Id. at 11.)

     Plaintiffs contend that an adverse inference sanction is
insufficient here for three reasons.  First, the remedy would
not correct the wrong because "[t]he nature of carriage of goods
by sea, where the only potential witnesses for miles will not
only be employed by the shipowner, but also likely be the people
who caused the harm in the first place, makes it far too easy
for the shipowner to hide [its] liability." (Reply Mem. at 9.)
Second, the Defendants themselves, not just their counsel, were
intimately involved with the discovery violations. (Id.)  Third,

43

the discovery violations go to the core of Plaintiffs' case.
(Id.)

The Court agrees with Defendants' position that a sanction
of a default judgment is inappropriate here.  The Court is
mindful of the instruction from the Court of Appeals that such a
sanction is not to be imposed lightly.  Alternative remedies are
sufficient to address the spoliation here.  In addition, the
collective relief awarded to Plaintiffs for the other discovery
violations discussed herein counsels against the imposition of a
default judgment. See West 167 F.3d at 780-81 (vacating a
default judgment and remanding for the district court to
"fashion an appropriate, but less severe, sanction for
plaintiffs' spoliation" because the district court "could have
combined alternative sanctions in a way that would fully protect
[the defendants] from prejudice").  Finally, because this case
will not be tried before a jury, the Court is well-situated to
assess and weigh the appropriate impact of the spoliated
evidence in this case.

The Court disagrees with Defendants' position that a
sanction of an adverse inference is inappropriate here.  Before
analyzing the three adverse inference factors, the Court is
compelled to address two threshold issues that are intertwined
with the spoliation analysis.  First, the Court rejects
Defendants' position that they were not required to produce the

44

Document Retention Memo. (Tr. at 67/19-21 ("MR. COHEN: That document was nearly 6 months after the incident and was not within the scope and framework, time framework, of the request for production."), 68/10-11 ("But that document was clearly not covered by the deposition document request period."); see also Suzuki Decl. ¶ 12 ("I was unaware this letter was included in [Plaintiffs' First and Second Requests for Production of Documents] for the reason that it had nothing to do with the facts involved in cargo loss forming the subject of this lawsuit, did not relate to the actual sale of the vessel and was prepared nearly six months after the event.").) Under the most narrow reading of one or more of the Requests in Plaintiffs' First Request for Production of Documents identified infra at 6-7, the Document Retention Memo was unquestionably responsive and should have been produced well before the last day of fact discovery.

Second, the Court dismisses Defendants' contention that "[t]here is no evidence that the documents were burned." (Tr. at 54/16.) In particular, Defendants contend that Captain Suzuki's testimony "actually confirms that [he] did not know whether the documents had been burned." (Cohen 7/30/07 Spoliation Ltr. at 1.) According to them, "Captain Suzuki never stated he knew the documents were 'incinerated'" but, rather, only that the documents were burned "'if' the vessel listened . . . [which] is

45

a far cry from admitting the documents were burned." (<u>Id.</u>
(emphasis in original).[36]  Based on the same testimony, the Court
draws the exact opposite conclusion.  Captain Suzuki's answers
were evasive and ultimately undermined by his admission that
certain documents listed in the Document Retention Memo "were
not needed" and "[t]hat's why we disposed." (<u>See</u> <u>supra</u> at 9.)
After all, Captain Suzuki is not only the person who belatedly
and inexcusably produced the Document Retention Memo to his
counsel days before his deposition on the last day of fact
discovery, but he is the President of Temm, the company that
created and issued the Document Retention Memo.  Moreover,
Captain Suzuki was designated as the Rule 30(b)(6) witness for
Sun Glory and Temm (because it had not been dismissed from the
case at that time). (<u>See</u> Opp'n Mem., Ex. 2 at 8/11-9/25.)

    Assuming <u>arguendo</u> that the Court were to credit Defendants'
argument that there is no admissible testimony to the effect
that certain documents were destroyed pursuant to the Document
Retention Memo, viewing the evidence in the light most favorable
to Defendants, this is still the only conclusion a reasonable
fact-finder could draw from the evidence in the record.  The

---

[36] In addition, Defendants' argument that Captain Suzuki's testimony only
demonstrates that the documents were "disposed" of, not "destroyed," is
nothing more than semantics. (Cohen 7/30/07 Spoliation Ltr. at 1.)  The key
point is that the documents no longer exist. The following colloquy at oral
argument is illustrative of this point. (<u>See</u> Tr. 83/2-8 ("MR. COHEN:  They
weren't burned.  That is a conclusion the evidence doesn't support.  THE
COURT:  So where do you say they were? MR. COHEN: They were not transferred.
They were taken off the vessel and brought back or they were destroyed.  THE
COURT:  So –– MR. COHEN: I don't know what happened to them.").)

existence of the Document Retention Memo itself and the
undisputed and otherwise unexplained failure of Defendants to
produce multiple categories of documents whose disposal was
called for by that Memo easily leads to the inference that they
were destroyed.  The question of whether the documents were
burned -- as instructed by the Document Retention Memo -- or
disposed of by some other method is wholly irrelevant.  The
point is that they were not produced.

       With respect to the first factor for an adverse inference,
Defendants' position that they did not have an obligation to
preserve the documents described _infra_ at 9-12 at the time they
were disposed of, transferred in the sale of the Vessel to a
third party, or otherwise no longer able to be accounted for, is
simply untenable.  The Court agrees with Plaintiffs that "there
was a clear duty to preserve these [navigational] documents,
because it should have been immediately clear to the Defendants
(especially after a Japan[ese] court proceeding was commenced)
that significant damage to Plaintiffs' cargo as a result of
their ship nearly sinking would result in a major claim." (Reply
Mem. at 10.)  Nothing in the April 20, 2005 Order of Judge Yuko
Hama of the Fukuyama Chapter, The Hiroshima District Court,
permitted Defendants to proceed the way they did, including with
the issuing and implementation of the Document Retention Memo.
It is unreasonable to assume that documents which are not sought

at the initial court-ordered investigation of a ship that is not out at sea, within a month or two of a not-insignificant cargo dispute involving international parties, are so irrelevant that they may be destroyed or disposed of in the ordinary course of business without notice to opposing counsel and/or further court order.

The fallacy of this assumption has been proven in the instant case where the accuracy of key documents initially sought by Plaintiffs, and produced by Defendants, such as the Vessel's log books, have now been called into question.  The Court of Appeals recently stated that "[its] admiralty jurisprudence is especially sensitive to the unexplained alteration of logbooks" and that "[w]here a logbook is altered, [it] 'cannot help avoid the conclusion that it had been dressed up to excuse the ship's faults.'" Otal Investments Ltd. v. M.V. Clary, 494 F.3d 40, 58 (2d Cir. 2007) (quoting Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, 102 F.2d 450, 453 (2d Cir. 1939)).

In addition to the deposition testimony of the Second Mate regarding the falsification of the Vessel's deck log book during the storm which caused the cargo damage (see supra at 27-28), the Chief Mate testified to the same effect.  The pertinent portion of his testimony is as follows:

MR. MALOOF:  And what would be [the Master's] verbal orders, what would they consist of typically when the weather was deteriorating?

CHIEF MATE:  To be aware of meeting [V]essel and to check the [V]essel position on hourly basis and one of the orders is, if the ship's speed is getting low, then we have to add another one scale to the wind force, the actual wind force that we observed.

. . .

MR. MALOOF:  The third one you said, adding to the boat's scale, is that what you said?

CHIEF MATE:  Yes, putting on record, on the logbook adding one scale higher to the actual wind force that is being observed.

. . .

MR. MALOOF:  Does the Beaufort scale number which you recorded in the [V]essel's logbook cover both wind and wave?

CHIEF MATE:  It is the direction of the wind and the force of the wind.

MR. MALOOF:  The force of the wind.  And what were the Master's orders to you to mark that number up, one Baufort scale or two Beaufort scales?

CHIEF MATE:  One or two Beaufort scales higher than actual observed.

. . .

MR. MALOOF:  . . . When you made entries on the logbook during those days, were you [sic] entries made accurately other than with respect to the Beauport [sic] scale?

. . .

CHIEF MATE:  You mean on the 17th of March?  My entries . . . on my turn of duty are correct.

MR. MALOOF:  And on the 18th, 19th and 20th your entries were accurate other than with respect to the Beaufort scale?

. . .

CHIEF MATE:  Yes, other than the Beaufort scale the rest is all right because the Beaufort scale, as I said before, there was an order from the Master to add one scale higher than the wind force that is being observed.

. . .

MR. MALOOF:  You served on the 18th at what hours, sir?

. . .

CHIEF MATE:  My hour was from 1600 to 2000 in the afternoon and from 4 o'clock to 8 o'clock in the morning.

MR. MALOOF:  Alright. When you made the Beaufort entries on that day, did you mark up . . . ah, were they accurate?

CHIEF MATE:  Yes, all the entries except the Beaufort scale which was one force added to make it 7.

MR. MALOOF:  When it should have been 6?

CHIEF MATE:  Yes, it should have been 6.

. . .

MR. MALOOF:  Did you serve again on the 19th from 4 to 8, is that right?

CHIEF MATE:  On the 19th it was recorded 9 when it should have been 8.

MR. MALOOF:  On the 19th and what time are you looking at?

CHIEF MATE:  On the 2000. While in the morning at 8 o'clock, it should been 7 instead of 8 because I have added 1 scale higher as per order of the Master.

(4/26/07 Maloof Ltr., Ex. 5 at 42/17-22, 43/9-12, 49/3-9,

87/4-6, 87/12-16, 88/9-11, 88/21, 89/7-14, 89/20-90/3.)

Defendants attempt to impeach the credibility of these witnesses by pointing out that they were "disgruntled employees who were never asked to come back to the [V]essel." (Tr. 34/18-19.)  Defendants' argument, however, goes to the weight of the testimony, not the fact of its existence in the record, and thus there is at least a disputed issue of fact as to the accuracy of the Vessel's deck log book.  Indeed, Mr. Cohen conceded this point at oral argument. (Tr. 34/22-23 (stating that "at the very least we have conflict in the testimony" on the deck log book).)[37]

Finally, to the extent that Defendants seek to excuse their failure to preserve logbooks and other documents on the ground that Plaintiffs failed to demand that all the documents be copied when they were granted access to the Vessel pursuant to the April 20, 2005 Order of Judge Yuko Hama of the Fukuyama Chapter, The Hiroshima District Court, Japan, the Court rejects

_____

[37] Regarding the Vessel's deck log book, Plaintiffs assert that "Defendants' weather expert . . . states that the Vessel only experienced 'peak periods' of Force 9 (and possibly a 'brief' period of Force 10) and significant wave heights of 8.8 meters," thereby admitting "that the [V]essel's log book entries (continual Force 10 winds and 14+ meter waves) are false." (Letter to the Court from Mr. Eagan to the Court, dated July 24, 2007, at 2 (citations omitted).)  In addition, with respect to the Vessel's official log book in Panama, Plaintiffs assert that "on the critical day of March 19, 2005," it contains different Beaufort scale entries from the Vessel's deck log book, demonstrating that "one of them was clearly false." (Reply Mem. at 18.) Because the parties agree that the issue of whether the Vessel's log books are accurate must await trial, the Court need not address the impact of the conflicts presented on this motion.

that excuse.[38]  Rather, as Plaintiffs proffer, the "reason why
[they] did not seek . . . to preserve other critical documents
like the Rough Sea 227 checklists was . . . because . . . [they]
did not know that the log books were a fraud, and that their
data would need to be heavily supplemented with correct data."
(Reply Mem. at 17.)  Accordingly, Plaintiffs have demonstrated
that Defendants had an obligation to preserve the logbooks and
other navigational documents at issue.

With respect to the second element for an adverse
inference, the Court also agrees with Plaintiffs that Defendants
had a "culpable state of mind." (Reply Mem. at 10 (quoting
Zubulake, 229 F.R.D. at 431 (citing Residential Funding, 306
F.3d at 109)).)  For the reasons stated above as to why the
first element of an adverse inference is satisfied, Defendants
were at least negligent in their destruction of the navigational
documents described in infra at 9-12.

Defendants' primary argument against the imposition of an
adverse inference is that Plaintiffs have not satisfied the

---

[38] Defendants' reliance on the Court of Appeals' decision in Allstate
Insurance Company v. Hamilton Beach/Proctor Silex, Inc., 473 F.3d 450, 457-58
(2d Cir. 2007), concluding that a district court's preclusion order as a
sanction for spoliation was an abuse of discretion, is misplaced. (See Opp'n
Mem. at 10.)  Unlike the instant case, Allstate did not involve a maritime
dispute which the Court of Appeals has recognized as raising unique
evidentiary issues. See Otal 494 F.3d at 58.  In addition, the inspection in
Allstate of the allegedly defective coffee maker was not pursuant to a court
order.  Most importantly, in Allstate, a representative of the party seeking
the preclusion order "affirmatively disclaimed any interest in the evidence"
after being provided a full and fair opportunity to examine the fire scene
and taking "detailed pictures" of the alternate potential ignition sources
besides the allegedly defective product. 473 F.3d at 457-58.

third element of that sanction, relevance.  At oral argument,
Defendants advanced the novel position that, for purposes of a
spoliation analysis, the concept of "relevance" with respect to
the third element of an adverse inference sanction is limited to
a party's burden of proof:

> MR. COHEN:  The burden of proving that the [V]essel
> was seaworthy, that it was properly manned, that it
> was properly navigated, is on the defendants.  This
> so-called destroyed evidence is not evidence which
> plaintiffs [are] required to sustain any burden of
> proof.  They don't have a burden of proof.
>
> THE COURT:  So your point is if the destroyed evidence
> is on an issue on which plaintiff does not have the
> burden of proof, then it's not relevant, is that . . .
> your point?
>
> MR. COHEN:  My point is that the requirement is that
> the evidence that was destroyed be relevant to the
> plaintiffs' claim such that you could find that the
> destroyed evidence would support that claim.
>
> . . .
>
> THE COURT:  And tell me now why you say it's not
> relevant.  I thought you were telling me it's not
> relevant because plaintiffs do not have the burden on
> this issue, is that what you are saying to me?
>
> MR. COHEN:  I am saying that to you.
>
> THE COURT:  How can that be true?
>
> MR. COHEN:  We, the defendants, have the burden.
>
> THE COURT:  So on any issue on which plaintiff doesn't
> have the burden documents can't be relevant?  Is that
> you point?
>
> MR. COHEN:  I am saying that if the plaintiffs don't
> have the burden and we don't have the documents, then
> it's up to the court --

THE COURT:  Then they can't be prejudiced.  That is your point.

MR. COHEN:  Yes, your Honor.

...

MR. COHEN:  If the evidence which was destroyed does not harm the plaintiffs' claim, then that part of the test for spoliation should fall away.  It becomes irrelevant.

THE COURT:  I am not sure I understand that.  If the evidence speaks to the plaintiffs' claim, if the evidence, for example, relates to the speed of the [V]essel, navigation of the [V]essel, weather conditions, even though the plaintiff might not have the burden of proof, those documents surely would be relevant, right?

MR. COHEN:  They may be relevant.

THE COURT:  Then don't tell me they are irrelevant.

MR. COHEN:  They may be relevant for certain purposes. For the purposes of a spoliation analysis, and only for the purposes of the spoliation analysis, I am suggesting to you that they are not relevant.

THE COURT:  I don't understand that.

MR. COHEN:  Because the lack of the documents do not harm the plaintiffs' case.

THE COURT:  Because plaintiff doesn't have the burden. We just did this.  You don't know of a case that says that.  You know of a case that says that, you let me know, all right?  Because I know of none.

MR. COHEN:  I will take a look at that, Judge.

(Tr. 45/4-46/7, 47/9-48/6.)[39]

---

[39] Following oral argument, Defendants summarized their position as to why the third element of an adverse inference sanction for spoliation is not satisfied here as follows:

    In the matter at bar, the allegedly spoliated documents are
                                              (continued on next page)

Following oral argument, Defendants directed the Court's attention to the Court of Appeals' decision in <u>Byrnie v. Town of Cromwell</u>, 243 F.3d 93 (2d Cir. 2001). In that case, the plaintiff brought an action for disparate treatment under the ADEA, 29 U.S.C. § 631(a), and Title VII, 42 U.S.C. § 2000e-2(a)(1). <u>Byrnie</u>, 243 F.3d at 101. As part of that plaintiff's <u>prima facie</u> case, he was required to establish that the adverse employment decision he complained of was made under circumstances giving rise to an inference of unlawful discrimination. <u>Id.</u> In setting forth the elements of a spoliation claim, the Court of Appeals stated that "[t]o obtain an adverse inference instruction, a party must show that the destroyed records were relevant to the party's claim or defense." <u>Id.</u> at 109. In holding that an adverse inference sanction was warranted due to spoliation, the Court of Appeals concluded that there was "ample evidence that the [spoliated] documents were relevant to Byrnie's case." <u>Id.</u> at 109. The

---

(continued from prior page)
    irrelevant to Plaintiffs satisfying their <u>prima facie</u> case of negligence against the Defendants because it is the Defendants who have the burden of establishing that the M/V MARITIME ANTALYA was seaworthy and manned by a competent crew. If the Plaintiffs establish that the cargo was placed aboard the M/V MARITIME ANTALYA in good order and condition but did not arrive at their location in such good order and condition, then the rebuttable presumption is that the Defendants were negligent in their transport of the cargo. As such, the allegedly spoliated documents have no bearing on the Plaintiffs' burden to establish the condition in which the cargo was delivered to the Vessel and the cargo's condition upon discharge in Japan.

(Letter from Mr. Cohen to the Court, dated July 30, 2007 (the "7/30/07 Cohen Burden of Proof Ltr."), at 2.)

Court of Appeals went on to state that "the fact that Cromwell [Board of Education] had to retreat from the specifics of its initial explanation for failing to hire Byrnie towards a more general, but less plausible, claim that Byrnie simply lacked familiarity with the basic competencies needed for good teaching makes it possible to infer that these explanations are pretext covering over the real explanation that would be disclosed by the destroyed documents." Id. at 110.

According to Defendants, Byrnie stands for the proposition that the Court of Appeals "employs a narrow relevance test" for spoliation sanctions because "the destroyed documents would assist the plaintiff in Byrnie in satisfying [his] burden of proof with respect to [his] prima facie claim for disparate impact." (7/30/07 Cohen Burden of Proof Ltr. at 2, 3.) Defendants' attempt to cabin the definition of "relevance" for purposes of a spoliation analysis is flawed for several reasons. First, the facts in Byrnie did not present the Court of Appeals with the opportunity to decide whether an adverse inference is inappropriate where the spoliated documents would disprove or contradict an adversary's affirmative defense.  As noted by Defendants, the spoliation issue in Byrnie concerned the plaintiff's prima facie case.  Second, in Residential Funding, the Court of Appeals subsequently held that "a court's role in the adverse inference analysis is limited to insuring that the

56

party seeking the inference had adduced enough evidence of the
contents of the missing materials such that a reasonable jury
could find in its favor." 306 F.3d at 109 n.4 (emphasis in
original). Nothing in this language suggests that the relevance
inquiry is limited to a party's burden of proof. A jury could
find in favor of a party that satisfies its burden of proof and
demonstrates that missing materials preclude its adversary from
establishing its affirmative defense. Third, Defendants' theory
is contrary to the instruction -- reaffirmed by the Court of
Appeals in its decision in Byrnie -- "that 'holding the
prejudiced party to too strict a standard of proof regarding the
likely contents of the destroyed evidence would subvert the
prophylactic and punitive purposes of the adverse inference, and
would allow parties who have intentionally destroyed evidence to
profit from that destruction.'" Id. at 110 (quoting Kronisch,
150 F.3d at 127-28). Finally, Defendants' theory runs afoul of
the Court of Appeals' holding that "[w]hen evidence is destroyed
in bad faith (i.e., intentionally or willfully), that fact alone
is sufficient to demonstrate relevance." Zubulake, 229 F.R.D. at
431 (citing Residential Funding, 306 F.3d at 109)). Under
Defendants' view, it would not be relevant if a party
intentionally or willfully destroyed all of the adverse
documents in its custody, possession, or control relating to an
issue on which it had the burden of proof, thereby leaving only

documents that support its position.  The Court of Appeals has rejected this argument.  <u>See</u> <u>Residential Funding</u>, 306 F.3d at 109.  Applied here, if Defendants destroyed all of the adverse documents in their custody, possession, or control relating to the issues of whether the Vessel was seaworthy and manned by a competent crew, they could successfully rebut the presumption that they were negligent in their transport of the cargo and, thus, would prevail on the issue of liability, and, under Defendants' theory, be immune from sanctions for document spoliation.[40]  This is, of course, an absurd result.

The speciousness of Defendants' position was best illustrated at oral argument during a discussion of the Rough Sea Checklist 227 for the voyage in question.  The Vessel's Rough Sea Checklist 227 indicates, <u>inter</u> <u>alia</u>, whether the Vessel considered proceeding to shelter or changing course/speed, whether all openings were closed/secured or water tight, and what the wind force and wave height were at the time.  (4/26/07 Maloof Ltr., Ex. 3.)  The colloquy was as follows:

---

[40] Indeed, that is the primary, if not the only, issue to be resolved at trial because there is no dispute in this case that Plaintiffs delivered the cargo in good order and condition to the Vessel and that it was not received by Plaintiffs in the same good order and condition. (<u>See</u> Tr. 38/11-13 ("THE COURT: Do you have any testimony that the cargo was not delivered [in Louisiana] in good order?  Yes or no.  MR. COHEN:  I don't have any."), 39/21-40/3 ("THE COURT:  Is there an issue of fact as to whether or not the cargo was not delivered at the other end [in Japan] in good order?  There is no issue on that.  MR. COHEN:  There is no issue on that.  THE COURT:  All right.  MR. COHEN:  As I said, the cargo in hold number one certainly turned out in a wetted condition by salt water.  There is no question about that.").)

58

MR. COHEN:  Lets talk about the documents and the relevance of those particular documents.  The plaintiffs have stated that the critical documents were a 227 rough weather checklist.  Now, how does that 227 rough weather checklist deal with the fact that a hole was created in the hatch during a storm?

THE COURT:  Would it not, for example, have told us whether or not a course or speed alteration was considered as we went into the storm?  Would that not tell us that?  And if it wasn't, that wouldn't be such a good fact for defendant, right?

MR. COHEN:  That is right.  It wouldn't be such a good fact for defendant.

THE COURT:  So why are you telling me it couldn't be relevant?

MR. COHEN:  Because it would not prejudice the plaintiff.

THE COURT:  Because plaintiff doesn't have the burden, right?

MR. COHEN:  We have to show that we were utilizing appropriate measures to navigate the vessel.  If we had in that 227 checklist that we did nothing, how would that change the fact that the corn was wetted because the hold was pierced by a wave?

THE COURT:  I don't understand the point there.  It's like apples and oranges.  If the captain and others did not consider a course or speed change in heading into the storm, that is a relevant fact that would have appeared on the 227 weather checklist, right?

MR. COHEN:  Not necessarily no.  Because the form does not necessarily require that you fill that out.

THE COURT:  I thought counsel told me that it was an ISM requirement.  Counsel, did you tell me that?

MR. MALOOF:  Yes, your Honor. There is a box they are supposed to check when they consider -- "change of course speed considered" is the box.

    MR. COHEN:  That is all they have to do is check the
    box.  There is no detail there.

    THE COURT:  So what if it says, no, we didn't consider
    it?  You are standing there telling me that is not
    relevant, is that what you are telling me?

    MR. COHEN:  There is no information there.

    THE COURT:  Are you telling me that --

    MR. COHEN:  No, I don't consider that to be relevant
    because there is better evidence on that question.

    THE COURT:  But it's no evidence or there is better
    evidence.

    MR. COHEN:  <u>Better evidence</u>.

    THE COURT:  That is hardly the same as not relevant.

(Tr. at 49/8-51/7 (emphasis added).)  Thus, contrary to

Mr. Cohen's assertions during oral argument, it is beyond cavil

that the lack of the spoliated documents in this case, such as

the Rough Sea Checklist 227 for the voyage in question harms --

and potentially is fatal to -- Plaintiffs' case.  Accordingly,

the Court rejects Defendants' request to "find the burden of

proof to be relevant in deciding whether to impose an adverse

inference." (7/30/07 Cohen Burden of Proof Ltr. at 3.)

    In sum, the Court concludes that the Document Retention

Memo, along with the 27 categories of documents, should have

been preserved and produced in this litigation, that the

Defendants were at least negligent in their disposal of those

records, and that those documents were relevant to the

Defendants' affirmative defense in this case.  In this

circumstance, the following adverse inference is warranted

pursuant to Rule 37(b)(2): the spoliated documents "would have

indicated that the Defendants failed to take adequate steps to

provide a seaworthy crew and that such caused th[e] loss" in

this case. (4/26/07 Maloof Ltr. at 6.)[41]


D.   Legal Standard for Rule 30(b)(6) Deposition

     "Under Rule 30(b)(6), when a party seeking to depose a

corporation announces the subject matter of the proposed

deposition, the corporation must produce someone familiar with

that subject." Reilly v. Natwest Markets Group Inc., 181 F.3d

253, 269 (2d Cir. 1999).  "To satisfy Rule 30(b)(6), the

---

[41] Defendants contend that "Plaintiffs' motion under Fed. R. Civ. P. 37 should be denied for willful failure to abide by this Court's Local Civil Rule 7.1." (Opp'n Mem. at 16.)  Rule 7.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York requires that "[e]xcept as otherwise permitted by the court, all motions . . . shall be supported by a memorandum of law . . . divided, under appropriate headings, into as many parts as there are to be determined. Willful failure to comply with this rule may be deemed sufficient cause for the denial of a motion . . . ."  Defendants' reliance on Wenzhou Wanli Food Co. v. Hop Chong Trading Co., No. 98 Civ. 5045, 2000 WL 964944, at *3 (S.D.N.Y. July 11, 2000) is misplaced because Judge John E. Keenan did not authorize the defendant in that case to submit an affidavit in lieu of a memorandum of law, and the affidavit contained no citation to statutes or case law.  This case is completely different.  First, the Defendants concede that "this Court previously deemed Plaintiffs' counsel's letters of April 26, 2007 and May 17, 2007 to be motions." (Opp'n Mem. at 16.)  Second, Mr. Cohen was afforded an opportunity to object (or clarify) the Court's ruling when it was given orally at the conclusion of the May 22, 2007 teleconference.  However, he declined to do so. (See Dkt. No. 106 (Transcript dated May 22, 2007, at 20/7-21/1).)  He also chose not to seek a modification or clarification of the Court's written order to that effect. (See Dkt. No. 92.)  Thus, the Court rejects Defendants' Local Rule 7.1 argument. Nevertheless, in reaching its determination on the various issues raised in Plaintiffs' motion, the Court takes into account Defendants' position that "this Court should limit relief available to Plaintiffs to that relief specified in the two letter motions of April 26, 2007 and May 17, 2007." (Opp'n Mem. at 17.)

corporate deponent has an affirmative duty to make available
'such number of persons as will' be able 'to give complete,
knowledgeable and binding answers' on its behalf." Id. (quoting
Securities & Exchange Comm'n v. Morelli, 143 F.R.D. 42, 45
(S.D.N.Y. 1992) (quotations omitted)).

"Producing an unprepared witness is tantamount to a failure
to appear." Bank of New York v. Meridien BIAO Bank Tanzania
Ltd., 171 F.R.D. 135, 151 (S.D.N.Y. 1997) (quoting United States
v. Taylor, 166 F.R.D. 356, 363, aff'd, 166 F.R.D. 367 (M.D.N.C.
1996) (citing Resolution Trust Corp. v. Southern Union, 985 F.2d
196, 197 (5th Cir. 1993)). "In order for the Court to impose
sanctions, the inadequacies in a deponent's testimony must be
egregious and not merely lacking in desired specificity in
discrete areas." Bank of New York, 171 F.R.D. at 151 (quoting
Zappia Middle East Constr. Co. v. Abu Dhabi, No. 94 Civ. 1942,
1995 WL 686715, at *8 (S.D.N.Y. Nov. 17, 1995)).

Under Rule 37(b)(2), "[i]f . . . a person designated under
Rule 30(b)(6) . . . to testify on behalf of a party fails to
obey an order to provide or permit discovery, . . . the court in
which the action is pending may make such orders in regard to
the failure as are just . . . ."[42]  When a failure occurs, the

_____

[42] "[T]he order disobeyed 'does not have to be a formal, written order.'" JSC
Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. and Trade Servs., Inc.,
No. 03 Civ. 5562, 2005 WL 1958361, at *14 n.10 (S.D.N.Y. Aug. 16, 2005)
(quoting 7 Moore's Federal Practice §§ 37.42[2], 37.42[3] (3d ed. 2007)).

Rule lists several illustrative examples of such orders, two of
which are particularly relevant to this motion:

> (A)  An order that the matters regarding which the
> order was made or any other designated facts shall be
> taken to be established for the purposes of the action
> in accordance with the claim of the party obtaining
> the order;
>
> (B)  An order refusing to allow the disobedient party
> to support or oppose designated claims or defenses, or
> prohibiting that party from introducing designated
> matters in evidence;

Fed. R. Civ. P. 37(b)(2)(A), (B).


E.   Application to Captain Suzuki's Rule 30(b)(6) Deposition

Based upon its review of Captain Suzuki's Rule 30(b)(6)
deposition testimony (see supra at 14-21) in the light most
favorable to Defendants, the Court concludes that his
performance with respect to the manner in which the Vessel and
its then-master Captain Fujimoto were audited by Temm amounts to
a non-appearance.  Here, the January 18, 2007 Discovery Order
instructed Defendants to produce a witness(es) to answer those
questions identified in Plaintiffs' November 21, 2006 letter.
(Reply Mem., Ex. 6 at 21/22-24.)  Sanctions are warranted under
these circumstances.[43]  See, e.g., Reilly, 181 F.3d at 268-69

---

[43] Plaintiffs appear to seek a finding of contempt for this violation.
(See Reply Mem. at 12 ("Defendants do contest that they were in contempt of
the January 18, 2007 Court conference order in this matter when they brought
Captain Suzuki to testify . . . .") (emphasis in original). "Civil . . .
contempt is a sanction to enforce compliance with an order of the court or to
compensate for losses or damage sustained by reason of noncompliance." McComb
(continued on next page)

(affirming the district court's order precluding two witnesses from testifying about the value of plaintiff-employee's work in an employment dispute because, inter alia, "[defendant] chose to produce only [a third, different witness to satisfy its Rule 30(b)(6) obligation] . . . despite [plaintiff's] complaints that [the witness] was not sufficiently knowledgeable about [plaintiff's] work"); Daval Steel Prods., Div. of Francosteel Corp. v. M/V Fakredine, 951 F.2d 1357, 1363, 1366 (2d Cir. 1994) (affirming the district court's sanction precluding a defendant from offering contrary evidence on the alter ego dispute as a result of its failure to comply with "an unequivocal order of the court requiring it to produce a witness for deposition, and to produce documents relating to that deposition"); cf. Factor v. Mall Airways, Inc., 131 F.R.D. 52, 55 (S.D.N.Y. 1990) ("In the instant case, no Court order has previously been issued

---

(continued from prior page)
v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949).  A party may be deemed in civil contempt for failure to comply with a court order if "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." Paramedics Electromedicina Comercial, Ltd. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 655 (2d Cir. 2004). "It need not be established that the violation was willful." Id.  "A civil contempt order is designed to be coercive rather than punitive." Huber v. Marine Midland Bank, 51 F.3d 5, 10 (2d Cir. 1995). See also Int'l Union, United Mine Workers v. Bagwell, 512 U.S. 821, 828 (1994) (stating that "[t]he paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command").  The Court need not address whether the requirements for a contempt finding have been met for this violation, because the relief is inappropriate at this stage.  Trial is scheduled to commence this month, and fact discovery has been closed for over five months.  The time for Defendants to comply with the January 18, 2007 Discovery Order has passed.

requiring plaintiff to comply with defendant's discovery
requests.  This alone militates against the entry of sanctions
at this time.").  Accordingly, pursuant to Rule 37(b)(2) and the
Court's inherent powers, the following fact is established for
the purposes of the action: "no proper audits of the Master or
[V]essel were performed." (5/17/07 Maloof Ltr. at 5.)[44]


F.   Legal Standard for Attorney Client and Work Product
     Privileges and the Crime/Fraud Exception

     Rule 501 of the Federal Rules of Evidence provides the
general rule that "the privilege of a . . . person . . . shall
be governed by the principles of the common law as they may be
interpreted by the courts of the United States in the light of
reason and experience."  The two privileges at issue with
respect to the facts and circumstances surrounding the
Recantation Affidavit are the attorney-client and work product
privileges.

     "The attorney-client privilege is "'the oldest of the
privileges for confidential communications known to the common
law.'" In re Richard Roe, Inc., 68 F.3d 38, 39 (2d Cir. 1995)
(quoting Upjohn Co. v. United States, 449 U.S. 383, 389 (1981)).
"The attorney-client privilege protects confidential
communications between client and counsel made for the purpose

---

[44] See supra note 41.

of obtaining or providing legal assistance." <u>In re County of Erie</u>, 473 F.3d 413, 418 (2d Cir. 2007) (citing <u>United States v. Const. Prod. Research, Inc.</u>, 73 F.3d 464, 473 (2d Cir. 1996)). The privilege applies so that:

> (1) [w]here legal advice of any kind is sought, (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his instance permanently protected, (7) from disclosure by himself or the legal adviser, (8) except the protection be waived . . . .

<u>Richard Roe</u>, 68 F.3d at 39-40 (quoting <u>United States v. Kovel</u>, 296 F.2d 918, 921 (2d Cir. 1961)). The Court of Appeals "consider[s] whether the predominant purpose of the communication is to render or solicit legal advice." <u>County of Erie</u>, 473 F.3d at 420.

"The protection given to attorney work product serves a similar purpose: 'to avoid chilling attorneys in developing materials to aid them in giving legal advice and in preparing a case for trial.'" <u>Richard Roe</u>, 68 F.3d at 39-40 (quoting <u>In re John Doe Corp.</u>, 675 F.2d 482, 492 (2d Cir. 1982)). "The work product doctrine protects an attorney's mental impressions, opinions or legal theories concerning specific litigation from disclosure. <u>Horn & Hardart Co. v. Pillsbury Co.</u>, 888 F.2d 8, 12 (2d Cir. 1989) (internal quotations and citation omitted). The Court of Appeals has held that "[a] party seeking discovery of attorney work-product must show 'substantial need,' for fact

work-product." In re Grand Jury Proceedings, 219 F.3d 175, 191
(2d Cir. 2000) (quoting Fed. R. Civ. P. 26(b)(3)).  "As for
work-product that shows 'mental impressions, conclusions,
opinions, or legal theories of an attorney,' [the Court of
Appeals has] held that 'at a minimum such material is to be
protected unless a highly persuasive showing [of need] is
made.'" Id. (quoting Fed. R. Civ. P. 26(b)(3)).

     "Nevertheless, '[i]t is well-established that
communications that otherwise would be protected by the
attorney-client privilege or the attorney work product privilege
are not protected if they relate to client communications in
furtherance of contemplated or ongoing criminal or fraudulent
conduct.'" Richard Roe, 68 F.3d at 40 (citation omitted).
"Although there is a societal interest in enabling clients to
get sound legal advice, there is no such interest when the
communications or advice are intended to further the commission
of a crime or fraud." Id.  However, "the crime-fraud exception
does not apply simply because privileged communications would
provide an adversary with evidence of a crime or fraud." Id.
Rather, "the crime-fraud exception applies only where there is
probable cause to believe that the particular communication with
counsel or attorney work product was intended in some way to
facilitate or to conceal the criminal activity." Id. See also
United States v. Jacobs, 117 F.3d 82, 87 (2d Cir. 1997) ("[T]he

proposed factual basis must strike a prudent person as
constituting a reasonable basis to suspect the perpetration or
attempted perpetration of a crime or fraud, and that the
communications were in furtherance thereof.") (internal
quotations and citations omitted).  In making the probable cause
determination, courts in this District often review, in camera,
the privileged document. See, e.g., Shahinian v. Tankian, 242
F.R.D. 255, 258 (S.D.N.Y. 2007); Boss Mfg. Co. v. Hugo Boss AG,
No. 97 Civ. 8495, 1999 WL 47324, at *2 (S.D.N.Y. Feb. 1, 1999);
accord NXIVM Corp. v. O'Hara, 241 F.R.D. 109, 132 (N.D.N.Y.
2007).

       "Once there is a showing of a factual basis, the decision
whether to engage in an in camera review of the evidence lies in
the discretion of the district court." Jacobs, 117 F.3d at 87
(citing United States v. Zolin, 491 U.S. 554, 572 (1989)). "[I]f
and when there has been an in camera review, the district court
exercises its discretion again to determine whether the facts
are such that the exception applies." Id.


G.     Application to the Cohen Recantation Affidavit Declaration
       Plaintiffs request that the Court disclose the Cohen
Recantation Affidavit Declaration submitted in camera so that
they can review it and, if necessary, respond. (Eagan 8/10/07

Ltr. at 1.)[45]   Defendants oppose that application. (8/21/07 Ltr. at 3.)[46]

After conducting an _in_ _camera_ review of the Cohen Recantation Affidavit Declaration, the Court concludes that the creation of the Recantation Affidavit is at least subject to the attorney work product privilege.  Without revealing any more information than is necessary to demonstrate that privilege, the drafting of the Recantation Affidavit reflected, _inter_ _alia_, the mental processes and opinion of counsel. See A.F.L. Falck, S.p.A. v. E.A. Karay Co., 131 F.R.D. 46, 49 (S.D.N.Y. 1990) (holding that a draft affidavit "is properly work product in this litigation" and not ordinarily discoverable under Rule 26(b)(3), but concluding that the "substantial need" element of the Rule was met because the witness was in Greece and unavailable); see also Ideal Elec. Co. v. Flowserve Corp., 230 F.R.D. 603, 608-09 (D. Nev. 2005) (holding that the draft affidavits at issue were protected by the work product privilege and rejecting the argument that "the inherent purpose of an affidavit to provide evidence from a witness belies any

---

[45] In addition, based in part on Defendants' asserted solicitation of false statements under oath, Plaintiffs sought leave to amend the Third Amended Verified Complaint to seek punitive damages. (See 4/26/07 Maloof Ltr. at 8-9.)  Defendants consented to that amendment, and the Court granted the application at oral argument. (See Tr. 107/10-25.) Thus, Plaintiffs already obtained certain relief based in part on the issue of the Recantation Affidavit.

[46] "8/21/07 Cohen Ltr." refers to Mr. Cohen's letter to the Court dated August 21, 2007.

contention that the work product doctrine protects draft affidavits"). Plaintiffs concede the issue of whether a privilege applies by focusing primarily on their position that "the crime-fraud exception vitiated any privilege." (Eagan 8/10/07 Ltr. at 1.)[47]

It is undisputed that the Second Mate was "solicited to change his testimony" to provide the Defendants with "assistance" in this case. (Tr. 64/14-25.) However, Plaintiffs' reliance on United States v. Ruhbayan, 406 F.3d 292 (4th Cir. 2005) for the proposition that "[s]oliciting a false statement for court proceedings comes within the crime fraud exception" is misplaced here. (Eagan 8/10/07 Ltr. at 1.) Although Defendants solicited the Recantation Affidavit to aid their case here, the Court's review of the Cohen Recantation Affidavit Declaration reveals that it was based on information provided to Mr. Cohen by others about the Second Mate's supposed desire to recant and thus was not prepared with the understanding that it contained false statements.

Even if certain aspects of the facts and circumstances surrounding the creation of the Recantation Affidavit resulted in the likelihood that the affidavit would contain false

---

[47] Plaintiffs also claim "that defendants waived any privilege" because "[they] opened the door by suggesting at the July 23 hearing that [the Recantation] [A]ffidavit was created merely as a draft to be accepted or rejected by Mr. Badilla." (Eagan 8/10/07 Ltr. at 1.) The Court does not conclude that Mr. Cohen waived any privileges at the oral argument because, inter alia, he was only responding to questions posed by the Court.

statements, that evidence is qualitatively of a different from
the evidence relied upon to support the application of the
crime-fraud exception in Ruhbayan.  In that case, which involved
criminal charges of perjury and obstruction of justice arising
out of misconduct in a prior criminal trial, the Fourth Circuit
affirmed the district court's admission of testimony from the
defendant's former lawyer and letters he wrote to the defendant
demonstrating that the defendant "sought information on
sentencing [possibilities] and that his former girlfriend
claimed responsibility for the pistol found in [his] van." 406
F.3d at 297 n.3.  As a result of his girlfriend's testimony,
defendant was acquitted of being a felon in possession of a
firearm in violation of 18 U.S.C.§ 922(g)(1).  Id. at 295-96.
"In light of the evidence on the crime-fraud point, particularly
[the defendant's] letters to [his girlfriend] [asking her to
confess to the gun found in his van] and her testimony about
contacting his lawyer [about testifying that the pistol found in
his van belonged to her], the court's finding that [the
defendant] had used his attorney to dupe the court and jury at
the First Trial was not clearly erroneous." Id. at 299.

    Accordingly, the Court concludes that the crime-fraud
exception does not apply here and declines to order the
disclosure of the Cohen Recantation Affidavit Declaration.

H.   Legal Standard for Rule 34 Production of Documents

Under Rule 34(a), "[a]ny party may serve on any other party a request" to produce any documents "within the scope of Rule 26(b) [i.e., regarding any matter, not privileged, that is relevant to the claim or defense of any party] and which are in the possession, custody or control of the party upon whom the request is served."  "The party upon whom the request is served shall serve a written response within 30 days after the service of the request." Fed. R. Civ. P. 34(b) (emphasis added).

Failure to obey a court order to produce documents pursuant to Rule 34 can result in the sanctions described above under Rule 37(b)(2).  Even if a party has not failed to comply with a court order regarding Rule 34, Rule 37(d) provides that "the court . . . may make such orders in regard to the failure as are just, and among others, it may take any action authorized under subparagraphs (A), (B), and (C) of subdivision (b)(2) of this rule."  In addition, "[i]n lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure." Fed. R. Civ. P. 37(d).  Such an award is authorized under Rule 37(d), "unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust."

72

I.   <u>Application to Captain Suzuki's Rule 34 Responses</u>

Prior to the post-oral argument submission of Captain Suzuki's Declaration, Defendants were not in compliance with the January 18, 2007 Discovery Order regarding their Rule 34 responses on the topics set out in Plaintiffs' December 13, 2006 letter.  The Court was clear in its instruction to Mr. Cohen to submit an affidavit in order to comply with Rule 34's express requirement that responses be written. (See supra at 22-23.)  In any event, Captain Suzuki's deposition testimony failed to address sufficiently two of the four topics described in Plaintiffs' December 13, 2006 letter. (See supra at 23-24.)  In circumstances such as this, courts in this District have imposed severe sanctions, including that of a default judgment. See, e.g., Nippon Fire & Marine Ins. Co., Ltd. v. MV Egasco Star, No. 1996 WL 74745, at *2-*3 (S.D.N.Y. Feb. 21, 1996) (striking defendants' answer and entering a default judgment pursuant to Rule 37(b)(2) as a result of defendants' failure substantially to comply with a prior court order to, inter alia, produce documents or confirm that they had made an adequate search for the requested documents).

If Defendants had not submitted Captain Suzuki's Declaration, the Court would have viewed Plaintiffs' request for sanctions on this topic in a different light.  The Court declines to impose any non-monetary sanctions as a result of

Plaintiffs' Rule 34 violation.  In reaching this determination, the Court takes into account the severity of the combined sanctions it is imposing as a result of this decision.  In addition, the Court examined the extent of the disclosures in Captain Suzuki's Declaration with respect to, inter alia, the topics which he failed to address adequately during his deposition. (See supra at 25-26.)  The Court also took into account Plaintiffs' silence as to the sufficiency of these supplemental disclosures in their post-oral argument submissions.

However, the Court imposes monetary sanctions under Rule 37(d).  For the reasons just discussed, Defendants' failure to comply initially with the January 18, 2007 Discovery Order regarding their Rule 34 responses was not "substantially justified," and no "other circumstance[] make[s] an award of expenses unjust." Fed. R. Civ. P. 37(d).  Thus, Defendants and Vandeventer Black LLP[48] are jointly and severally liable to Plaintiffs for "the reasonable expenses, including attorney's fees," caused by their failure on this issue.

---

[48] Vandeventer Black LLP is the attorney of record for the Defendants. (Dkt. Nos. 61, 80, & 87.)  Mr. Cohen is a partner at that firm and the attorney apparently in charge of this matter.

J.      Legal Standard for Contention Interrogatories

Rule 33(c) of the Federal Rules of Civil Procedure authorizes a party to propound interrogatories seeking the contentions of the responding party.  It provides in pertinent part as follows:

> An interrogatory otherwise proper is not necessarily objectionable merely because an answer to the interrogatory involves an opinion or contention that relates to fact or the application of law to fact, but the court may order that such an interrogatory need not be answered until after designated discovery has been completed or until a pre-trial conference or other later time.

Fed. R. Civ. P. 33(c).  As stated by Senior District Judge Peter K. Lesiure, "[c]ontention interrogatories . . . are one of many discovery tools designed to assist parties in narrowing and clarifying the disputed issues and reducing the possibility of surprise at trial." Wechsler v. Hunt Health Sys., Ltd., No. 94 Civ. 8294, 1999 WL 672902, at *1 (S.D.N.Y. Aug. 27, 1999). See also 7 James Wm. Moore et al., Moore's Federal Practice § 33.02[2][b] (3d ed. 2007) (discussing the propriety, usefulness, and timing of contention interrogatories).

As described above, Rule 37(b)(2) permits a court to impose sanctions "[i]f a party . . . fails to obey an order to provide or permit discovery."  In addition, the provisions of Rule 37(d) which are applicable to Rule 34 violations also apply to Rule 33 violations. Fed. R. Civ. P. 37(d) ("If a party . . . fails . . .

to serve answers or objections to interrogatories under Rule 33

. . . the court in which the action is pending on motion may

make such orders in regard to the failure as are just, and among

others it may take any action authorized under subparagraphs

(A), (B), and (C) of subdivision (b)(2) of this rule."

K.    Application to Heavy Weather Contention Interrogatory

     Defendants contend that they did not violate the January

18, 2007 Discovery Order requiring them to respond to

Plaintiffs' contention interrogatories because they responded on

February 15, 2007 and supplemented their responses on

May 25, 2007. (Opp'n Mem. at 3-4.)  In particular, Defendants

assert that there is no prejudice to Plaintiffs because all of

the witnesses and documents identified in their supplemental

responses were included in their initial disclosures served on

June 14, 2006 pursuant to Rule 26(a)(1). (Tr. 89/23-90/3.)

     Plaintiffs assert that they were prejudiced by having to

"put in their expert reports on May 15, 2007, without [the]

designations" in Defendants' supplemental responses. (Reply Mem.

at 4.)  Plaintiffs contend that they did not depose H. Kawakita

and N. Seki, two of the ten witnesses identified in Defendants'

supplemental response to Contention Interrogatory Number Two,

and would have done so during the discovery period if they had

known that Defendants intended to rely on them at trial. (Tr. 93/10-13.)

Moreover, Plaintiffs assert that they would have taken third party discovery related to the log book of the M/V Gull Arrow, a ship near the Vessel during the storm that caused the cargo damage, if they had known that Defendants intended to rely on that document at trial. (Tr. 90/9-22, 93/10-23.) Specifically, Plaintiffs claim that they would have taken discovery related to the authenticity of the M/V Gull Arrow's log book. (Tr. 96/15-17.) Because of the spoliation of documents (see supra at 42-61) and the disputed issue of fact with respect to the veracity of the Vessel's deck log book (see supra at 48-51), all of which were described above, the M/V Gull Arrow's log book has assumed central importance. Defendants assert that the entries in the log book of the M/V Gull Arrow corroborate the entries in the Vessel's deck log book and, thus, their position that they provided a seaworthy vessel manned by a competent crew but that the cargo damage was an Act of God and/or peril of the sea. (Tr. 34/24-35/3, 36/2-7, 36/20-23.)

The Court concludes that Defendants did not comply with its January 18, 2007 Discovery Order pertaining to contention interrogatories. Among other reasons for this conclusion is that Defendants' supplemental responses identified only witnesses and documents that were part of their initial

disclosures served more than six months beforehand.  Defendants

certainly could have identified those materials on

February 15, 2007 -- before the close of fact discovery -- and

supplemented their responses in whatever way they felt was

appropriate based on the remaining discovery.  Thus, Defendants

have failed to show cause why, with a little over one month of

fact discovery left at the time of the Court's ruling, they

could not identify those materials on February 15, 2007.

At oral argument, the Court discussed the proper remedy for

this violation with the parties. (Tr. 94/5-97/19.)  Mr. Cohen

stated that he did not oppose the reopening of discovery and

Defendants would agree to pay the expenses of a deposition

related to the M/V Gull Arrow's log book. (Tr. 96/5-11, 97/9-

11.)  However, the problem with this remedy is that it

undermines the purpose of contention interrogatories described

above by Judge Leisure, results in inefficient and expensive

pre-trial litigation, and undermines the Court's

January 24, 2007 Order setting the schedule for the submission

of damages experts reports.  In addition, as described in great

detail herein, the Court is aware that this disagreement arises

in the context of a much broader discovery dispute spanning

multiple issues and is conscious not to view each one in

isolation.  The Court agrees with the Mr. Maloof's statement at

oral argument as to why the Defendants' remedy of additional

discovery at their expense is insufficient in this case:

> Your Honor, I think unfortunately everything here is
> cumulative and that would be one little Band-Aid and
> it's unfortunately a kind of a bleeding sore.  It's
> true [Defendants] could fly the witnesses here at
> [their] expense and [Plaintiffs] can take their
> deposition and then we could give those depositions to
> our experts.  They could rewrite their reports.  We
> can do all of this in the next couple of weeks so that
> we would have time to do the pretrial order but the
> preclusion order would be more appropriate.  Allowing
> the thief to pay back the money does not really
> provide the necessary deterrent.

(Tr. 96/20-97/5.)

Accordingly, pursuant to Rule 37(b)(2) and the Court's

inherent powers, the Court prohibits Defendants from calling H.

Kawakita and N. Seki to testify and from introducing the M/V

Gull Arrow's log book into evidence at trial. (Maloof 4/26/07

Ltr. at 4-5; Maloof 5/17/07 Ltr. at 5.)[49]

In addition, as with Defendants' Rule 34 violation, the

Court imposes the mandatory monetary sanctions under Rule 37(d).

For the reasons just discussed, Defendants' failure to comply

initially with the January 18, 2007 Discovery Order regarding

their Rule 33 contention interrogatory responses was not

"substantially justified," and no "other circumstance[] make[s]

an award of expenses unjust." Fed. R. Civ. P. 37(d).  Thus,

Defendants and Vandeventer Black LLP are jointly and severally

---

[49] See supra note 41.

liable to Plaintiffs for "the reasonable expenses, including attorney's fees," caused by their failure on this issue.


L.   Legal Standard for Precluding Expert Testimony

Rule 26 provides that disclosure of expert testimony "shall be made at the times and in the sequence directed by the court." Fed. R. Civ. P. 26(a)(2)(C).  Rule 37 provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . , is not, unless such failure is harmless, permitted to use as evidence at trial . . . any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1).  "[A]lthough a 'bad-faith' violation of the Rule 26 is not required in order to exclude evidence pursuant to Rule 37, it can be taken into account as part of the party's explanation for its failure to comply." Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006) (emphasis in original).

The Court of Appeals has set forth the following to determine whether to preclude testimony: (1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance. See Outley v. City of New York, 837 F.2d 587, 590-91 (2d Cir. 1988); see also Patterson v.

80

Balsamico, 440 F.3d 104, 117 (2d Cir. 2006).  This analysis also applies to the preclusion of expert testimony. See Softel, Inc. v. Dragon Med. & Scientific Communications, Inc., 118 F.3d 955, 961-63 (2d Cir. 1997).


M.   Application to Damages Expert Reports

     Regarding Defendants' explanation for failing to comply with the Court's January 24, 2007 Order setting forth the damages expert report schedule, this factor weighs in favor of Plaintiffs.  According to Mr. Eagan, he negotiated the stipulated schedule for the submission of damages' expert reports with Ed Powers, one of Defendants' counsel. (Eagan Decl. ¶ 1.)[50]  Mr. Eagen declared that they "ultimately agreed that the party who had the burden of proof on a particular damages issue would go first on May 15, 2007" and that "[t]he word 'responsive' was used in the stipulation as it was assumed based upon [their] discussions that each side would submit on May 15." (Id.)  In connection with this motion, Mr. Powers did not submit a declaration.  Instead, Mr. Cohen submitted a declaration that did not speak to the parties' intent or understanding but, rather, conclusorily asserted that "the posture of this litigation suggests that [damages] expert reports are at this

_____

[50] "Eagan Decl." refers to the Mr. Eagan's Declaration dated June 15, 2007.

time superfluous and that neither party is entitled to introduce expert reports on damages as evidence at trial." (Cohen Aff. ¶ 4.)[51]

With respect to the importance of the expert testimony Plaintiffs seek to exclude and the prejudice that would be suffered by Defendants, these two factors weigh in favor of Defendants.  Before this decision, one of the key disputed issues of fact to be resolved at trial was whether Plaintiffs mitigated their damages.  As a result of this ruling, that issue may be the only key disputed fact remaining for trial.  As noted above, the Court will be the trier of fact in this case and it is of the view that such testimony would assist it in resolving that issue.

Finally, a continuance is not a possibility nor is it warranted here.  At the outset, the Court notes that Plaintiffs, who filed this motion, are not seeking this remedy.  Both sides have submitted expert reports on the issue of mitigation of damages, and expert discovery is complete.  The Court also notes that having actively overseen the pre-trial proceedings in this case, including a lengthy and failed effort to select an agreed-upon mediator, proceeding with the October 22, 2007 trial best serves the interests of justice here.

---

[51] "Cohen Aff." refers to Mr. Cohen's Affidavit dated June 8, 2007.  The document was submitted as Exhibit 13 to Defendants' Opposition Memorandum of Law to Plaintiffs' Motion for Sanctions.

Thus, three of the four factors weigh against the issuance of a preclusion order here.  The Court is also mindful that the preclusion of evidence, let alone expert evidence, "is a drastic remedy and will apply only in situations where the failure to disclose represents a flagrant bad faith and callous disregard of the rules." Babcock v. Rezak, No. 96 Civ. 0394, 2002 WL 31654995, at *1 (W.D.N.Y. Nov. 6, 2002).  Accordingly, as a result of this timing dispute, Defendants are not precluded from submitting expert testimony on Plaintiffs' purported failure to mitigate their damages at trial, assuming, of course, that proper disclosure has been made as to such testimony.

CONCLUSION

For the reasons stated above, Plaintiffs' motion for discovery sanctions [dkt. no. 93] is granted in part and denied in part.  To summarize, the Court imposes the following non-monetary sanctions: (1) an adverse inference that the spoliated documents would have indicated that the Defendants failed to take adequate steps to provide a seaworthy crew and that such caused the loss in this case; (2) a finding of fact that no proper audits of Captain Fujimoto or the Vessel were performed; and (3) a preclusion order prohibiting Defendants from calling H. Kawakita and N. Seki to testify and from introducing the M/V Gull Arrow's log book into evidence at trial.

In addition, Defendants and Vandeventer Black LLP are jointly and severally liable to Plaintiffs for the reasonable expenses, including attorney's fees, caused by their violation of the January 18, 2007 Discovery Order concerning Rules 33 and 34.  Plaintiffs shall set forth the amount of such fees by affidavit at a convenient time no later than thirty days after trial concludes.  Defendants may submit papers within five business days thereafter.

SO ORDERED:

DATED:      October 4 , 2007
            New York, New York

LORETTA A. PRESKA, U.S.D.J.